**SCHUTT ATHLETIC SALES COMPANY and Athletic Helmet, Inc., Plaintiffs,**

v.

**RIDDELL, INC., Defendant.**

**No. 89 C 5560.**

United States District Court, N.D. Illinois, E.D.

Dec. 21, 1989.

Richard H. Compere, Jeffrey A. Handelman, Williams Brinks Olds Hofer Gleason & Lione, Chicago, Ill., for plaintiffs.

Lowell E. Sachnoff, Arnold A. Pagniucci, Sachnoff & Weaver Ltd., Chicago, Ill., John M. Calimafde, David H. Kagan, Anthony A. Coppola, Hopgood, Calimafde, Kalil, Blaustein & Judlowe, New York City, for defendant.

## MEMORANDUM OPINION AND ORDER

ZAGEL, District Judge.

### I.  FACTS

The plaintiff Schutt Athletic Sales Company ("Schutt") is a Delaware corporation with its principal place of business in Litchfield, Illinois.  The plaintiff Athletic Helmet, Inc. ("AHI") is a Delaware corporation with its principal place of business in Knoxville, Tennessee.  In April, 1987 Schutt purchased AHI, which was the successor to the football helmet business of Bike Athletic Company.[1]  The majority of the plaintiffs' business is in manufacturing and servicing football helmets.  Schutt also manufactures a limited amount of other sports equipment.  The defendant, Riddell, Inc. ("Riddell"), is a competing manufacturer of football helmets, which comprises approximately 75% of its business.  The balance of Riddell's business is devoted to the manufacture of sports equipment, largely body pads for use in football.

The National Football League ("NFL") is an association of 28 member clubs each of which owns a professional football team.  The National Football League Properties, Inc. ("NFLP") is a corporation jointly owned by the NFL teams and is responsible for the marketing and promotion of the NFL through the licensing of trademarks of the NFL and its member clubs to independent companies for use on products sold at retail and in approved promotional programs.

Both the plaintiffs and the defendant manufacture and market two basic types of football helmets: varsity helmets marketed to institutional purchasers such as high schools, colleges, and professional teams; and youth helmets marketed to the junior varsity and "Pop Warner" level.  Varsity helmets are a clearly defined and separate market from youth helmets.  It is not ad-

---

1. We refer to Schutt and AHI collectively as Schutt.

vised for high school players to use junior helmets because the junior helmets would not withstand the harder hitting that occurs at the more advanced level of play.

The number of firms manufacturing and selling football helmets in the United States has been steadily declining in the past decade, apparently in part due to the increased risk of tort liability stemming from injuries to players wearing the helmets. Also, the increase in the price for varsity helmets has exceeded the rate of inflation in the last ten years. Schutt alleges this price increase is due to Riddell's "leadership" in the helmet business. However, no evidence supports this allegation.

Neither party has introduced sufficient evidence to delineate clearly market share in any market discussed herein. We can, however, make some general observations. Riddell is the largest manufacturer of all football helmets in the United States. Also, both Riddell and Schutt have significant shares of the varsity football helmet market. With respect to the NFL, by February 1989, NFLP concluded a survey of NFL teams inquiring, among other things, the percent of Riddell helmets used by the NFL team. Written responses from 22 teams indicated that 60% of the NFL players used Riddell helmets. The NFLP telephoned the remaining six teams. The results of this survey indicated that 60–70% of all NFL players used Riddell helmets. With respect to the overall varsity helmet market consisting of the NFL, colleges, and high schools, Schutt submitted testimonial evidence that Riddell had approximately 50% of the market in 1988, in terms of the 200,000 total units sold. Both Riddell and Schutt have relatively minor shares of the youth football helmet market even though almost half of the helmets sold by both parties since 1987 have been youth helmets.

Both Riddell and Schutt use a small number of independent sales representatives who market the helmets to independent dealers who in turn sell their helmets almost entirely to teams at the professional, college, high school, junior high school, and "Pop Warner" levels. All professional teams and the majority of college teams employ equipment managers and trainers, who along with team coaches are experienced and sophisticated buyers of football equipment. These buyers purchase helmets in bulk for their respective teams and, the evidence suggests, consider comfort, quality, and price as the most important factors in their purchasing decisions. It is not unusual for high school football teams not to employ equipment managers and trainers. Thus the purchasing decisions with respect to football helmets are often made by individual athletic directors and football coaches.

The evidence indicates that varsity football helmets are rarely purchased individually over a retail counter. The evidence also indicates that typically at the junior high school and "Pop Warner" levels, coaches, who are often parents of players, purchase junior helmets in bulk either for teams or for leagues. It is also not uncommon for a parent to purchase in retail a junior helmet for his or her child. However, Schutt has not introduced any evidence demonstrating the percentage of junior helmets purchased singly rather than in bulk. Rather, Schutt's best evidence of the percentage of single junior helmet purchases was the testimony of a single, albeit a large, dealer located in Seattle, half of whose youth helmet sales were single purchases by individuals.

On April 11, 1988 Riddell and the NFLP entered into an Agreement (the "Agreement") stating briefly that in return for providing free helmets, pads and jerseys to each NFL team, Riddell would receive the exclusive right to display its logo during NFL games on the helmets of those players who choose to wear the Riddell brand. The tradename—the word "Riddell"—can be seen in the front of the helmet on the "nose bumper", on the side of the helmet on the chin strap, and in the back of the helmet at the helmet's base. While NFL players remain free to wear the helmet of their choice, the Agreement stipulates that manufacturers' logos other than Riddell's must remain covered during league play. Also, the responsibility of enforcing the

Agreement with each NFL team lies solely with Riddell and not with the NFLP.

Riddell contends that it contracted with the NFLP for the exclusive right to display its logo during NFL play in order to advertise and promote a separate line of retail products that it will soon market to the general public. Riddell also contends that it signed the Agreement to enhance its ability to license the Riddell trademark for athletic footwear and athletic clothing to be sold in the future at retail for general public use. At the time of trial, Riddell did not have a separate line of retail products, retail footwear, or retail athletic clothing.

From 1987 until the signing of the Agreement, some NFL teams had a policy of covering the trademarks that appeared on the nose bumper of football helmets with the team name or logo. If a team did not have such a policy, then the various trademarks of the helmet manufacturers would be visible during NFL games. Neither before nor after the signing of the Agreement had any NFL team a policy regarding the uniformity of helmets worn by players. The NFL also has no such standard or rule.

The parties disagree on the effect the Agreement has had and will have on the sale of football helmets. First, Schutt claims that what NFL players wear will have a significant influence on what equipment is purchased for and used by youth league players. Although Schutt introduced evidence that tended to demonstrate that youth players may be influenced by what helmets NFL players wear, Schutt produced insufficient evidence to establish that those who actually purchase helmets— team coaches and parents—will be influenced by what helmets NFL players wear.[2] With respect to individual youth helmet sales to parents, Schutt sought to establish that a youth player's preference for a football helmet will influence the purchasing decision of his parent. Although expert testimony demonstrated that Riddell's trademark appearing on NFL helmets will influence the youth players' preferences for helmets, Schutt presented no evidence linking those preferences to actual purchasing decisions of the youths' parents. While it may be conceivable, for example, that a child's preference for a brand of baseball may substantially influence his parent's purchasing decision, Schutt does nothing to convince us this is true for the considerably more important decision of buying protective headgear used in contact football.

With respect to bulk purchases in the youth market, the evidence indicates that size, fit, quality, price and service were the most important factors that youth team coaches and league coordinators considered in deciding which helmets to purchase. Schutt's contention that these purchasers are generally parents of youth players does not convince us that the advertisement of Riddell's logo during NFL game play will change their helmet purchasing preference.

With respect to the sale of varsity helmets to high school teams, Schutt introduced evidence of several high school football coaches and athletic directors who testified that their helmet purchasing decisions are influenced in part by what helmets professional players wear. It is noted that the Agreement does not dictate which helmets the players will wear. One of Schutt's arguments in this respect is that coaches will largely or exclusively see "Riddell" logos on NFL players' helmets and erroneously conclude that all players wear Riddell helmets. Consequently, as this argument goes, coaches will be influenced to purchase Riddell helmets. We do not believe high school coaches and athletic directors are this prone to confusion. In addition, even if coaches are influenced by what helmets NFL players wear, the exclusive display of Riddell's logo during NFL play is not the only source from which coaches may determine what helmets NFL players wear. As Schutt itself notes with respect to Riddell's sales techniques: "Salesmen will also tell high school coaches or purchasing agents that the helmets they are selling are used by the pros." Schutt, as well as Riddell, employs salesmen.

2. Schutt does not suggest nor does the evidence show that a statistically significant number of youth players themselves purchase football helmets.

With respect to varsity helmet sales to college teams, Schutt does not make a serious argument or offer substantial evidence that coaches, equipment managers, or trainers will be influenced by what helmets professional football players wear. In addition, plaintiffs' advertising and marketing expert, Hal Ernest, conceded that purchasers of helmets for the collegiate teams would not be influenced by advertising or promoting the fact that a helmet is worn by the pros. In each of these findings of a lack of influence, Schutt fails to offer sufficient proof, such as survey proof, to establish that the relevant helmet purchaser will be influenced by observing Riddell's brand name on a helmet during an NFL game.

With respect to varsity helmets sold to the NFL, the evidence is undisputed that each NFL player selects his brand of football helmet. Schutt argues, however, that the Agreement will put pressure on players to wear Riddell helmets. We note that in the Agreement, in order for an NFL team to be eligible for all the free and discounted equipment from Riddell, at least 90% of its players must use Riddell helmets. The free and discounted equipment totals less than $50,000 per team. In light of the substantial operating budgets of NFL teams, including the salaries paid to the players, we find it unlikely that individual teams will have sufficient incentive to apply pressure to force players to change helmet brand preference or use. Even if there were sufficient incentive pressure, Schutt has not produced any evidence to convince us this is so.

Schutt did not offer sufficient evidence that the Agreement will substantially effect its ability to promote and market its helmet. We recognize that the advertising value of the Agreement for Riddell is substantial. However, numerous other avenues of advertisement are available to Schutt, such as catalogues and similar promotional and sales materials. Some of these alternatives include print media directed specifically at helmet purchasers, such as coaches and equipment managers, and advertisements that include endorsements and photographs of players using Schutt's helmets. The evidence did not rule out the possibility that Schutt might deal with the College Football Association (or its members) as Riddell did with the NFLP. Although Schutt may be correct that the Agreement gives Riddell a marketing advantage, we do not find today that Schutt is incapable of successfully marketing its helmet.

Schutt also asserts without sufficient evidentiary support that prospective customers of helmets, upon seeing unbranded NFL helmets, will be confused into believing that unbranded helmets, in fact all NFL helmets, were manufactured by Riddell. We note that Schutt's AIR helmets contain a visible back sizer (a pad inside the helmet that protects the neck and base of the cranium), whose bottom edge uniquely resembles a saw-tooth design. No other helmet contains this feature, which seems to distinguish Schutt's helmet from others. We consequently find that potential purchasers of helmets, especially sophisticated purchasers such as college coaches, trainers and equipment managers, and high school coaches and athletic directors, will likely not be confused that the unbranded helmets are Riddell helmets.

## II. DISCUSSION

This court has jurisdiction of the parties and of the subject matter of this proceeding under the Sherman Act, sections 1 and 2 (15 U.S.C. sections 1 and 2), the Clayton Act, sections 4 and 16 (15 U.S.C. sections 15 and 26), the Federal Trademark Act, section 39 (15 U.S.C. section 1121), and 28 U.S.C. sections 1331, 1337, and 1338. Jurisdiction is also based on the doctrine of pendent jurisdiction. Venue is proper in this district under 28 U.S.C. sections 1391(b) and (c).

### A. *Antitrust Claims*

The plaintiffs base their antitrust claims on sections 1 and 2 of the Sherman Act, and sections 4 and 16 of the Clayton Act, and on the Illinois Antitrust Act (Ill.Rev. Stat. ch. 38, pars. 60–3(2) and 60–3(3)). Because the standards for relief under the Illinois Act and the Sherman Act are essentially the same, *see Marrese v. American*

*Academy of Orthopaedic Surgeons,* 726 F.2d 1150, 1155–56 (7th Cir.1984) (*en banc*) *rev'd on other grounds,* 470 U.S. 373, 105 S.Ct. 1327, 84 L.Ed.2d 274 (1985), we will limit the following discussion to the plaintiffs' federal antitrust claims.

### 1. Section 1 of the Sherman Act

Section 1 of the Sherman Act forbids "[e]very contract, combination ... or conspiracy, in restraint of trade or commerce among the several States." 15 U.S.C. sec. 1. In a Sherman Act section 1 claim we evaluate the challenged conduct under one of two tests: the per se analysis or the Rule of Reason analysis.

### a. Per Se Analysis

■ To establish a claim under section 1 of the Sherman Act, a plaintiff must ordinarily show the anticompetitive effect of the defendant's challenged conduct. A plaintiff will prevail, however, when the defendant's conduct rises to the level of a per se offense. The per se rule will apply when "the practice facially appears to be the one that would always or almost always tend to restrict competition and decrease output...." *Broadcast Music, Inc. v. CBS,* 441 U.S. 1, 19–20, 99 S.Ct. 1551, 1562, 60 L.Ed.2d 1 (1979); *see also National Collegiate Athletic Ass'n v. Board of Regents of University of Oklahoma,* 468 U.S. 85, 103–04, 104 S.Ct. 2948, 2961–62, 82 L.Ed.2d 70 (1984) ("Per se rules are invoked when surrounding circumstances make the likelihood of anticompetitive conduct so great as to render unjustified further examination of the challenged conduct."). The Seventh Circuit has said that "if the elimination of competition is apparent on a quick look, without undertaking the kind of searching inquiry that would make the case a Rule of Reason case in fact if not in name, the practice is illegal per se." *General Leaseways, Inc. v. National Truck Leasing Ass'n,* 744 F.2d 588, 595 (7th Cir.1984).

■ The courts have developed several categories of per se violations: (1) price fixing agreements, *United States v. Socony–Vacuum Oil Co.,* 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129 (1940); (2) horizontal market divisions, *United States v. Topco*

*Associates, Inc.,* 405 U.S. 596, 92 S.Ct. 1126, 31 L.Ed.2d 515 (1972); (3) group boycotts or concerted refusals to deal, *Klor's, Inc. v. Broadway–Hale Stores, Inc.,* 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959); and (4) certain tying arrangements, *International Salt Co. v. United States,* 332 U.S. 392, 68 S.Ct. 12, 92 L.Ed. 20 (1947). Of the four categories, Schutt argues that the NFL teams are engaged in a group boycott, and are thus engaged in a per se violation. We find no boycott on the part of the NFL teams and Riddell. As we discussed earlier, NFL players are free to wear any helmet they choose. Also, Schutt did not produce sufficient evidence to establish, as Schutt suggests, that NFL teams will "stop buying or severely cut back purchases of competitors' helmets to meet the 90% requirement."

■ Schutt also argues that the Agreement constitutes a per se violation because the Agreement gives Riddell "exclusive access to an element essential to effective competition." *Northwest Wholesale Stationers, Inc. v. Pacific Stationery and Printing Co.,* 472 U.S. 284, 296, 105 S.Ct. 2613, 2620–21, 86 L.Ed.2d 202 (1985). In fact, the crux of Schutt's section 1 claim is that the Agreement violates the antitrust laws because it denies to Schutt a promotional opportunity that is essential to its ability to compete. However, the evidence does not indicate that the Agreement precludes Schutt from advertising its helmets effectively in other avenues. We find that under any of Schutt's suggested interpretations of "essential element", *see Fishman v. Estate of Wirtz,* 807 F.2d 520, 539 (7th Cir.1986), the appearance of a manufacturer's trademark on NFL helmets during game play is not essential to Schutt's ability to compete effectively. Although we agree that the appearance of the trademark has advertising value, this form of advertising is not essential, necessary, or indispensable to effective competition. Schutt faces no severe handicap in being denied use of this form of advertising and it is not economically infeasible for Schutt to compete through substitute means of advertising. For instance, Schutt has not

shown itself precluded from dealing with the College Football Association (or its members) as Riddell did with the NFLP.

The success of a competing manufacturer of helmets, BSN (which markets the MaxPro helmet), indicates that the display of a manufacturer's logo on helmets during NFL league play is not essential to the sale of football helmets generally. As acknowledged by Schutt, BSN has steadily increased sales of its MaxPro helmet despite the fact that it has not had its logo displayed during NFL team play. BSN has succeeded in part by being awarded contracts for which it is the lowest bidder. The MaxPro helmet has competed effectively without its trademark appearing on NFL helmets during game play.

Although "[t]he per se rule is a valid and useful tool of antitrust policy and enforcement", *Broadcast Music*, 441 U.S. at 8, 99 S.Ct. at 1556, we find that it does not apply here to the alleged violative conduct of Riddell.

### b. Rule of Reason Analysis

■ Because we find that the defendant's conduct does not fall within a category of activity that is conclusively presumed an unreasonable restraint of trade or anticompetitive, we turn to the Rule of Reason test to determine the central question in this case: the actual or probable anticompetitive effects of the Agreement. To establish a claim for violation of section 1 under the Rule of Reason, a plaintiff must show: (1) that the defendant has market power in the relevant market; (2) that the defendant's conduct is likely to have an adverse effect on competition; and (3) that the antitrust violation will cause the plaintiff's injury. *General Leaseways*, 744 F.2d at 596; *Havco of America, Ltd. v. Shell Oil Co.*, 626 F.2d 549, 556 (7th Cir.1980).

In defining the relevant market, a court may look at well-defined submarkets which will, themselves, constitute relevant markets for antitrust purposes. *Brown Shoe Co. v. United States*, 370 U.S. 294, 324, 82 S.Ct. 1502, 1523, 8 L.Ed.2d 510 (1962). *Brown Shoe* offers the following guidance for determining submarkets for antitrust purposes:

The boundaries of such a submarket may be determined by examining such practical indicia as industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors.

370 U.S. at 325, 82 S.Ct. at 1524.

More recently the Seventh Circuit has stated that a "relevant market is comprised of those 'commodities reasonably interchangeable by consumers for the same purposes....'" *Fishman*, 807 F.2d at 531 (*quoting United States v. E.I. DuPont de Nemours & Co.*, 351 U.S. 377, 395, 76 S.Ct. 994, 1007, 100 L.Ed. 1264 (1956)). "In making this determination, the trier must decide whether the product is unique or has close substitutes, as to which there are substantial cross-elasticities of demand." *Id.* (*citing Cass Student Advertising, Inc. v. National Educational Advertising Service, Inc.*, 516 F.2d 1092, 1094–95 (7th Cir.), *cert. denied*, 423 U.S. 986, 96 S.Ct. 394, 46 L.Ed.2d 303 (1975)).

As applied to our case, these definitions make abundantly clear that youth helmets, either in a separate submarket or as part of the universe of all football helmets used in contact football, are not part of the "relevant market" for purposes of this Sherman Act claim. Both parties concede that varsity and youth helmets are not interchangeable and represent two distinct markets. Varsity helmets are different in construction from youth helmets and sell for almost double the price of youth helmets. Rather, Schutt advances two alternatives for the relevant market: (1) the NFL market and (2) the varsity helmet market.

The NFL is not the relevant market. The crux of Schutt's argument, for which Schutt introduced substantial evidence, is that the NFL is a promotional tool for the sale of varsity and youth helmets elsewhere. *See Hendricks Music Co. v. Steinway, Inc.*, 689 F.Supp. 1501, 1506 (N.D.Ill. 1988). Although the NFL represents a different level of play from the rest of foot-

**1228**

ball, and may be a well-defined submarket for other purposes, the evidence indicates for purposes of this Sherman Act claim, that the indicia of a distinct submarket are not present with respect to the NFL.

The plaintiffs rely on *International Boxing Club v. United States,* 358 U.S. 242, 79 S.Ct. 245, 3 L.Ed.2d 270 (1959) to suggest that the NFL is a separate submarket. In *International Boxing,* the promotion of professional boxing events was at issue. The Supreme Court held that the promotion of championship boxing contests constituted a "separate, identifiable market" from the promotion of non-championship professional boxing matches. If the promotion of NFL games were at issue here, *International Boxing* would govern. *See also Fishman v. Estate of Wirtz,* 807 F.2d 520 (7th Cir.1986) (relevant market was live professional basketball in Chicago). We do not disagree with Schutt's description of the NFL as a "showcase for supreme athletic talent and legendary competitive play." However, promotion of NFL games is not the issue.

At issue in the case before us is the sale of football helmets to football players and teams. In this regard, we find Judge Hart's opinion in *Hendricks Music Co. v. Steinway, Inc.,* 689 F.Supp. 1501 (N.D.Ill. 1988) instructive. In *Hendricks Music,* the plaintiff owned a piano dealership in which it sold Steinway pianos. The defendant, the manufacturer and distributor of Steinway pianos, sought to terminate the plaintiff's dealership because of the plaintiff's agreement to begin selling Yamaha concert pianos in addition to Steinway pianos. The plaintiff cried foul and sued Steinway, alleging Steinway was engaged in an exclusive dealership arrangement. The plaintiff, seeking an injunction based in part on the Sherman Act, section 1, argued that the relevant market for antitrust purposes was the manufacture and sale of concert grand pianos.

The court rejected that argument and found that the relevant market was the manufacture and sale of all acoustic pianos, of which concert pianos constitute a small fraction. The court stated that the

plaintiff's argument on the relevant market point

> overlooks the undisputed fact that, for both Steinway and Yamaha, the putative markets in concert pianos ... exist essentially only as a means to create a public perception that their respective pianos are the choice of artists. In so doing, they hope to convince the public of the prestige and quality of their respective brands, with the ultimate objective of promoting sales in the market for acoustic pianos generally.

*Id.* at 1507. The court found that Steinway and Yamaha viewed concert grand pianos as "promotional tools to promote their positions on the overall acoustic piano market." *Id.* Consequently, the court determined that the area of effective competition was the overall acoustic piano market, and not the putative smaller concert piano submarket.

■ *Hendricks Music* is not unlike the case before us in which Schutt contends that the NFL constitutes an incomparable promotional opportunity. We find that for the purpose of selling football helmets the area of effective competition is the overall varsity helmet market.

Football helmets are manufactured to two basic specifications: varsity and youth helmets. Varsity helmets are marketed to high schools, colleges, and professional teams. The helmets worn at these levels are interchangeable. Varsity helmets have the same characteristics and uses, are produced identically, and are sold through institutional dealers in the same fashion. We do not think the identical use of a varsity football helmet at the professional, college, and high school levels is a "superficial commonality", as Schutt suggests. Rather, it indicates one product market. Youth helmets, on the other hand, are marketed to junior high schools and youth league organizations. We thus conclude that for purposes of this Sherman Act claim, the relevant market is all varsity football helmets.

■ Market power "is normally inferred from possession of a substantial percentage of the sales in a market carefully defined in terms of both product and geogra-

phy." *Valley Liquors, Inc. v. Renfield Importers, Ltd.,* 678 F.2d 742, 745 (7th Cir.1982) (*"Valley I"*). Riddell has between 60 and 70% of the helmet sales to the NFL and approximately 50% of the varsity helmet market, a substantial market share. Market power is also the "power to raise prices significantly above the competitive level without losing all of one's business." *Valley Liquors, Inc. v. Renfield Importers, Ltd.,* 822 F.2d 656, 666 (7th Cir.1987) (*"Valley II"*) (*quoting Valley I,* 678 F.2d at 745); *see also N.C.A.A. v. Board of Regents of University of Oklahoma,* 468 U.S. 85, 109 n. 38, 104 S.Ct. 2948, 2964 n. 38, 82 L.Ed.2d 70 (1984) ("Market power is the ability to raise prices above those that would be charged in a competitive market."). The only indication that Riddell fits this latter definition is Schutt's assertion that Riddell has been the leader in a significant football helmet price increase over the past decade. Schutt has not introduced sufficient evidence to convince us of this. However, we do find that Riddell has a substantial percentage of the sales to the NFL and in the varsity helmet market. From the limited number of varsity helmet makers and Riddell's substantial share of that market we draw the inference that Riddell has market power in the varsity helmet market.

The next element that Schutt must, but does not, establish is the requisite anticompetitive effect. Schutt does not argue that the Agreement has yet produced any cognizable injury. For instance, Schutt introduced no evidence of lost sales. Rather, Schutt relies entirely on the argument that the effect of the Agreement will prospectively hinder competition in the varsity helmet market. In this regard, Schutt makes two intertwined arguments: (1) the trickle down theory—that the Agreement will have the direct effect of increasing the number of NFL players who wear Riddell helmets, which effect will influence the purchasing decisions made at the younger levels of football in favor of Riddell; (2) the trickle up theory—younger players, who will increasingly use Riddell helmets due to the trickle down theory, will prefer, and therefore continue, to wear Riddell helmets

as they step up in levels of play. The result, Schutt argues, "will have a substantial effect on the sale of football helmets, especially in the long term." The Agreement, "if permitted to continue, will stifle competition by injuring and/or eliminating both existing and potential new competitors, thereby harming consumer welfare." Despite the persuasive appeal of this argument, Schutt has failed evidentially to support several of the assumptions underlying this argument.

First, Schutt has not demonstrated that professional football teams will require their players to wear Riddell helmets despite the lure of free Riddell equipment. Some of the equipment that Riddell has agreed to give free to teams if 90% of that team's players wear Riddell helmets, such as jerseys, would be available gratis elsewhere. Also, in light of the substantial operating budgets of NFL teams, the amount of free equipment is very small. In addition, Schutt itself argues, although to a different conclusion, that "NFL teams have a significant interest in keeping these highly paid [NFL] players healthy." We conclude from this assertion that NFL teams have greater incentive to make independent purchasing decisions, based less on the opportunity to receive free equipment than on safety concerns for team players. We are not persuaded that the direct effect of the Agreement would be to increase the number of Riddell helmets worn by NFL players to the level suggested by Schutt. However, even if the number of NFL players wearing Riddell helmets were to increase substantially, Schutt still leaves unsupported its assumptions regarding the anticompetitive effect on the relevant varsity helmet market.

Second, as previously discussed, we are unconvinced that the appearance of the Riddell trademark on NFL helmets during game play will alone influence the purchasers of varsity helmets. The evidence shows that the actual purchasers of varsity helmets consider a number of factors in selecting a helmet, such as quality, price, fit, comfort, and service. Schutt's best example of the group most influenced by the

Riddell logo appearing on helmets during NFL game play is youth players. However, these youths are irrelevant for our purposes here because neither are they the actual purchasers of the helmets nor, more importantly, do the helmets they wear comprise the relevant market under the Sherman Act. The alleged effect of the Agreement on these youths would represent an injury upon a class too remote to be cognizable.

Third, Schutt introduced no evidence establishing the relationship between the (youth) helmet worn by a youth with his preference in a varsity helmet. Schutt concedes that the youth and varsity helmet markets are different. In fact, the two markets are substantially different in manufacturer composition, in addition to the previously described product differences. In the youth market, several manufacturers, who are not in the varsity helmet market, compete and both Riddell and Schutt have smaller market share. While we may assume that a player's helmet preference will remain constant as he moves up competitive levels yet stays within one helmet market, we are unconvinced that the preference transition from youth to varsity helmet is as clear as Schutt assumes. Schutt wishes us to assume that the step from junior high school football, for example, to high school football is the same as from high school football, for example, to college football. However, the first example represents two distinct markets; the second represents one. Thus, despite the force of Schutt's argument that youths are highly influenced by the helmets worn by professional football players on television and their preferences will be concomitantly effected, Schutt ignores the gap between the youth and varsity markets.

Riddell's explanation for its signing the Agreement with the NFLP is for the promotion of a new line of retail athletic clothing it plans to unveil soon. We conclude from the testimony of Riddell's chairman that this explanation is valid.

The final element that Schutt must prove is that the antitrust violation will cause Schutt injury. As discussed previously, we find that Schutt has other avenues of advertising its Air helmet. Although the Agreement certainly has advertising value for the Riddell helmet, the Agreement does not preclude Schutt from effectively advertising its own helmet brand under different strategies and in other mediums.

Thus we find that although Riddell has market power in the relevant market, Schutt has not demonstrated the requisite anticompetitive effect or any injury, and therefore Schutt has failed to establish a claim for a violation of Sherman Act, section 1.

### 2. Section 2 of the Sherman Act

In order to prevail on a Sherman Act, section 2 claim, a plaintiff must demonstrate that the defendant's actions constitute an attempt to monopolize. In order to prove an attempt to monopolize in violation of section 2, a plaintiff must show: (1) a specific intent to monopolize; (2) predatory or anticompetitive conduct engaged in to further the purpose to monopolize; and (3) a dangerous probability of success in the relevant market. *Lektro–Vend Corp. v. Vendo Co.*, 660 F.2d 255, 269–70 (7th Cir.1981), *cert. denied* 455 U.S. 921, 102 S.Ct. 1277, 71 L.Ed.2d 461 (1982).

Schutt wishes us primarily to infer from the circumstances Riddell's specific intent to monopolize. The evidence, however, does not reflect the requisite violative intent. Schutt suggests as the most tangible evidence of this intent a Riddell officer's memorandum which states that Riddell helmet salesmen should seek "100%" market share. After hearing the in-court testimony of the officer and placing the memorandum in context, we interpret the debated phrase as rhetoric and hyperbole, designed to inspire Riddell salesmen to greater achievement. We do not consider it an indication of Riddell's monopolistic intent.

Riddell's chief executive officer claimed that the purpose of Riddell in entering the Agreement was to develop retail customer recognition for licensing agreements and for the impending release of a line of retail products. As previously discussed, in considering the veracity of his in-court state-

ments, we conclude that this purported rationale is credible. We rely heavily on these statements in finding no intent to monopolize.

As discussed with respect to the alleged anticompetitive conduct of section 1, we similarly find no anticompetitive conduct under section 2. For the reasons stated above, we conclude that the Agreement was not intended to, nor is it likely to, frustrate or eliminate competition.

Finally, we find no dangerous probability that Riddell will succeed in monopolizing the varsity football helmet market. Schutt is correct that Riddell has a substantial market share and that there are few competitors in the market. However, we are influenced in part by the entrance and growth in market share of the MaxPro helmet. BSN has apparently succeeded by selling its helmet for less money than Schutt or Riddell. Also, for the reasons we have stated, Schutt has failed to convince us that the probable effect of the Agreement will be anticompetitive or will lead to a Riddell monopoly in this market. In reaching this conclusion we keep in mind that "the Sherman Act's prohibition against attempted monopolization does not require that the attempt in fact ripen into an actual monopoly. It is the attempt which is the offense." *Lektro–Vend Corp.*, 660 F.2d at 270. We find no attempt.

### 3. Illinois Antitrust Act

As we noted, in addition to its federal antitrust claims, Schutt claims violations of two sections of the Illinois Antitrust Act that parallel its Sherman Act counts. Ill. Rev.Stat. ch. 38, pars. 60–3(2) and 60–3(3). The language of paragraph 60–3(2) closely tracks the language of section 1 of the Sherman Act and the language of paragraph 60–3(3) is very similar to the language of section 2 of the Sherman Act. *Collins v. Associated Pathologists, Ltd.*, 844 F.2d 473 (7th Cir.1988). Based upon these similarities and for the reasons stated with respect to the parallel Sherman Act counts, we hold that the Agreement does not violate the Illinois Antitrust Act.

### B. *Trademark Claim*

Schutt also brings a trademark claim based on section 43(a) of the Lanham Act, 15 U.S.C. sec. 1125. This section provides that "[a]ny person who shall affix, apply, or annex, or use in connection with any goods or services ... a false designation of origin, or any false description or representation ... shall be liable to a civil action ... by any person who believes that he is or is likely to be damaged by the use of any such false description or representation." *Id.* This section provides a cause of action against any party causing a false designation to be used in commerce which tends to cause a likelihood of confusion on the part of the consuming public. Schutt argues that the Agreement is "likely to cause substantial confusion, especially among younger players and consumers."

A finding of likelihood of confusion is the keystone to a finding of infringement. The issue of the likelihood of confusion is whether the ordinary buyer in the marketplace would likely be confused. Thus, confusion regarding competing trademarks among the public generally is insufficient to establish infringement. The plaintiff must show that the relevant class of consumers is or will likely be confused. Some courts have held that the relevant class need not be restricted to the purchasers or potential purchasers of the trademarked goods at issue. However, the relevant class must consist at least of those consumers who will exert a substantial influence on the purchasing decision between the competing trademarked products. Were the relevant class not restricted so, this test of confusion would cease to reflect the actual practices of the market. Consequently, we find that "young players and consumers" do not fit into the class of consumers for whom the likelihood of confusion is a meaningful test to determine infringement.

We find that the relevant class consists of the equipment managers, athletic directors and coaches at the professional, college and high school levels; and the league coordinators, coaches and purchasing parents at the youth level. Although

we recognize that young football players may in fact be confused as to the source of non-Riddell marked helmets they may notice during NFL games, we find that fact irrelevant to the issue of infringement here.

The crux of Schutt's argument is that because the Agreement allows only Riddell trademarks to appear on players' helmets during NFL game play, viewers will mistakenly conclude that even unmarked, non-Riddell helmets are Riddell helmets. Schutt contends that because a majority of NFL players currently wear Riddell helmets and because the incentives for teams to increase the number of their players who wear Riddell helmets is allegedly great, the likelihood that consumers will erroneously conclude that all NFL helmets are Riddell helmets is also great. This hypothecated conclusion is the nub of Schutt's claim of likely confusion.

For many of the reasons previously stated, we do not find Schutt's argument persuasive. Most importantly, Schutt has introduced no evidence of confusion. We therefore find that the relevant class of consumers have not and will likely not confuse Schutt for Riddell helmets.

C. *Tortious Interference Claim*

Schutt also seeks recovery under Illinois state law alleging tortious interference with prospective business advantage. The elements of this tort are: (1) plaintiff's reasonable expectation of entering into a business relationship; (2) defendant's knowledge of that expectation; and (3) intentional interference by defendant that prevents plaintiff from realizing that expectation. *Fishman*, 807 F.2d at 546.

Schutt has not proven these three elements. As to the first element, Schutt concedes that it currently "has a business relationship with the NFL through [its] dealers." Schutt further argues that it has a "reasonable expectation of promoting and selling [its] football helmets in the NFL market and the varsity football helmet market on an equal basis with Riddell." Schutt's attempt to stretch this tort to assign liability on the facts before us is without merit. The Agreement does not pre-

clude Schutt from entering into any business relationships with any purchasers of varsity helmets.