**Irwin ASHKANAZY, d/b/a Ash Distributing, Plaintiff,**

v.

**I. ROKEACH & SONS, INC., Defendant.**

**No. 86 C 9247.**

United States District Court, N.D. Illinois, E.D.

Feb. 4, 1991.

dismissing the pendent claim, this argument is rendered moot.

Stephanie Wenkert Kanwit, Lamet, Kanwit & Davis, Chicago, Ill., for plaintiff.

Mark Philip Cohen, Schoenberg, Fisher & Newman, Ltd., Chicago Ill., for defendant.

## MEMORANDUM AND ORDER

MORAN, Chief Judge.

Allegedly losing his competitive edge in the market for kosher-for-Passover foods in the Chicago area because of the defendant's unfair and illegal trade practices, plaintiff Irwin Ashkanazy ("Ashkanazy"), owner of Ash Distributing ("Ash"), has brought this suit against rival I. Rokeach & Sons ("Rokeach"), alleging a variety of antitrust and pendent state claims. Now before this court is Rokeach's comprehensive motion for summary judgment. For the following reasons, that motion is granted in part and denied in part.

### FACTS

Rokeach is a New Jersey corporation that manufactures and sells kosher food products. Rokeach sells its products nationally through a system of distributors, some independent and some subsidiary. In the Chicago area, Rokeach's products are distributed by Central Kosher Sales ("Central Kosher"), which has represented Rokeach since approximately 1982. Until July 1989, Rokeach owned 60% of the voting stock of Central Kosher and 50% of its ownership stock; Rokeach acquired the remaining interest in 1989, rendering Central Kosher a wholly owned subsidiary. Ashkanazy is complaining of activity that dates back to 1983, but for the purposes of this motion, Rokeach has assumed that the actions of Central Kosher are attributable to Rokeach and that Rokeach competes in Chicago through Central Kosher. With respect to actions taken in the Chicago market, then, the terms "Rokeach" and "Central Kosher" are functionally interchangeable. Central Kosher distributes kosher food products to chain retail grocery stores, independent retail grocery stores, and institutions (nursing homes, schools, and camps) in the Chicago area.

Ash also distributes kosher food products, but its patronage is limited in geographic scope to kosher food buyers in Illinois, Iowa, Minnesota, and Wisconsin; the bulk of its sales, however, are in the Chicago area. Ashkanazy operates his business out of rented space in a Chicago warehouse and usually delivers from his car. Ash does not distribute to retail chain stores but competes with Rokeach for the business of institutions and independent retail stores in the Chicago area.

At issue in this suit are four kosher food items prepared for Passover consumption: gefilte fish in cans and glass jars, borscht, canned vegetable soups, and matzo products; together, these four items form the relevant product market, kosher-for-Passover foods. Both the plaintiff and the defendant sell a broader range of products than those represented in the market defined for purposes of this action: Rokeach also markets chicken soups, schav, shortening, honey, tomato mushroom sauce, spices, candles, silver polish, foaming cleanser, kosher soap, various Israeli products, and baked goods. Ash distributes sundry items such as housewares, school supplies, and health and beauty aids, in addition to a variety of kosher food products.

Jewish dietary laws require that during Passover observant Jews eat kosher food that has been prepared with different ingredients and according to strict religious standards and rules that differ from those that govern the preparation of daily kosher foods. Although the Passover season lasts only eight days, Ashkanazy claims that kosher-for-Passover food sales account for 60% of his total business and estimates that a similar percentage of Central Kosher's sales is attributable to kosher-for-Passover foods.

Ashkanazy has defined the relevant geographic market as the area in which he competes with Rokeach: the greater Chicago area, southwestern Wisconsin, and Indiana. Rokeach does not contest this description. Nor does Rokeach, for the purposes of this motion, dispute Ashkanazy's characterization of separate markets for sales to retail independents ("retail independent market") and for sales to institutions ("institutional market").[1]

Institutional sales of kosher-for-Passover food products target primarily nursing homes, for schools are not open during the Passover season. Since late 1984, many nursing homes have purchased kosher-for-Passover foods through a group purchasing agent called Econocare. Members of the group call orders into Econocare, which places them with the suppliers that it feels will best serve the homes. The suppliers bill the nursing homes directly, and Econocare receives a monthly service fee from its members, who remain free to purchase directly from suppliers in addition to or instead of purchasing through Econocare.

Ashkanazy's five-count complaint asserts antitrust and state common law and statutory violations in both the institutional and the retail independent markets. In Count I, he alleges that Rokeach has, since 1983, been engaged in an attempt to monopolize the relevant markets through a variety of anticompetitive acts in violation of section 2 of the Sherman Act, 15 U.S.C. § 2 (1988); Count II asserts that Rokeach has illegally tied the sale to institutions of certain kosher-for-Passover food items to the sale of single-serve portions of margarine, known as "readies," which are required by observant Jews during the Passover season; Count III contains a pendent state claim of intentional interference with contractual and prospective relations; Count IV sets forth claims of price discrimination in the retail independent and institutional markets in violation of section 2(a) of the Robinson–Patman Act, 15 U.S.C. § 13(a) (1988), and of illegal promotional credits and services offered in violation of sections 2(d) and 2(e) of the Robinson–Patman Act, 15 U.S.C. §§ 13(d), 13(e) (1988); and in Count V, Ash alleges a cause of action for consumer fraud and deceptive practices under Illinois law, Ill.Rev.Stat. ch. 121½, para. 261 *et seq.* (1989).

## DISCUSSION

Summary judgment is appropriate under Rule 56(c) of the Federal Rules of Civil Procedure "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law"; the rule is designed "to isolate and dispose of factually unsupported claims or defenses." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323–24, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). Despite the sometimes contradictory evidence presented in conjunction with a motion for summary judgment, the judge must not weigh the evidence or rule in favor of the merely more persuasive position but rather must determine whether the evidence is sufficient to

---

1. Although the relevant product market described in Ashkanazy's complaint does not explicitly distinguish between retail and institutional sales, (*see* Complaint ¶ 10 ("The relevant product market is the manufacture and sale of Kosher for Passover food products, sold by the parties to both retail stores and institutions and hence to the ultimate consuming public")), the complaint does divide the market into these two components when asserting Rokeach's market share, claiming that Rokeach has 75 to 80 percent of the institutional markets and 40 percent of the retail market (*id.* ¶ 15). In his response to Rokeach's summary judgment motion, moreover, Ashkanazy speaks more directly of the institutional market as distinct from the retail one (Plaintiff's Memorandum at 2).

create "a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986); *see also Illinois Bell Telephone Co. v. Haines & Co.*, 905 F.2d 1081, 1087 (7th Cir.1990), *petition for cert. filed* (Nov. 2, 1990). The nonmovant's evidence must therefore be believed, and reasonable inferences must be drawn in his favor. *Anderson*, 477 U.S. at 255, 106 S.Ct. at 2513.

A genuine issue exists if there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. *Id.* at 248, 106 S.Ct. at 2510. The standard therefore mirrors the guidelines for a directed verdict, which require the judge to direct a verdict if the evidence permits only one reasonable conclusion. *Id.* at 250, 106 S.Ct. at 2511. With respect to issues on which the nonmovant bears the burden of proof, the movant need only point out the lack of evidence supporting the nonmovant's position; the nonmovant then must offer affirmative evidence to create a genuine issue. *See Celotex*, 477 U.S. at 322–23, 106 S.Ct. at 2552–53. The nonmovant's evidence must present more than a "metaphysical doubt" regarding material facts, and the specific issues must be evaluated in the context of the record as a whole and with reference to the economic plausibility of the nonmovant's claim. *See Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986). If the claim is rendered implausible by virtue of the factual context, the nonmovant "must come forward with more persuasive evidence to support [his] claim than would otherwise be necessary." *Id.* at 587, 106 S.Ct. at 1356. In the context of this case, an analysis of the evidence is complicated not by the plethora of evidence but by its paucity. Apparently a follow-up to an antitrust case in a different district and involving somewhat different parties and markets, this case is, comparatively speaking, a low-budget affair, with the parties working and reworking the same tid-

bits of evidence to support their respective positions.

## A. Sherman Act Section 2 Violation: Attempted Monopolization [2]

■ Section 2 of the Sherman Act reaches not only those firms that successfully attain monopoly status through exclusionary practices but also those that engage in exclusionary practices that would, if successful, accomplish monopolization and, although falling short, " 'approach so close [to successful monopolization] as to create a dangerous probability of it.' " *Lektro-Vend Corp. v. Vendo Co.*, 660 F.2d 255, 270 (7th Cir.1981), *cert. denied*, 455 U.S. 921, 102 S.Ct. 1277, 71 L.Ed.2d 461 (1982) (quoting *American Tobacco Co. v. United States*, 328 U.S. 781, 785, 66 S.Ct. 1125, 1127, 90 L.Ed. 1575 (1946)); *W.H. Brady v. Lem Products, Inc.*, 659 F.Supp. 1355, 1370 (N.D.Ill.1987). To prevail on a claim of attempted monopolization, a plaintiff must prove "(1) specific intent to achieve monopoly power, (2) predatory or anticompetitive conduct directed to accomplishing this unlawful purpose, and ... (3) a dangerous probability that the attempt to monopolize will be successful." *Indiana Grocery, Inc. v. Super Valu Stores, Inc.*, 864 F.2d 1409, 1413 (7th Cir.1989).

### 1. Specific Intent

■ A showing of mere intent to win the business of rivals does not satisfy the "specific intent" requirement of the attempt offense. *See Great Escape, Inc. v. Union City Body Co.*, 791 F.2d 532, 541 (7th Cir. 1986); 3 P. Areeda & D. Turner, *Antitrust Law* ¶ 822a, at 314–15 (1978). Rather, specific intent to monopolize implies an intent to control prices or destroy competition unreasonably. *See United States v. Empire Gas Corp.*, 537 F.2d 296, 302 (8th Cir.1976), *cert. denied*, 429 U.S. 1122, 97 S.Ct. 1158, 51 L.Ed.2d 572 (1977). Although consistently listed in this circuit as a separate inquiry from the anticompetitive or predatory conduct requirement, specific intent is often established by the same evidence that

**2.** Although Ashkanazy makes several references in his filings to a completed monopoly, his complaint states a cause of action only with respect to attempted monopolization, and the argumentation in his memorandum is geared exclusively toward establishing the offense of attempt.

is used to prove exclusionary conduct. *See Chillicothe Sand & Gravel Co. v. Martin Marietta Corp.*, 615 F.2d 427, 430 (7th Cir.1980); *Great Escape*, 791 F.2d at 541; *cf. Illinois Bell*, 905 F.2d at 1087. This conflation of standards is likely a reaction to the difficulty of distinguishing between statements that reveal an actual malevolent intent and statements that reflect competitive zeal; the absence of any anticompetitive conduct might render an otherwise damning statement benign. *See Lektro–Vend*, 660 F.2d at 273 ("while some [of defendant's] references might arguably support a finding of specific intent if the evidence had established the existence of predatory acts or dangerous probability, we cannot say that the district court's finding of no specific intent was clearly erroneous in light of the plaintiffs' failure to establish these other factors."). Conversely, the absence of subjective evidence of intent may give rise to an inference that a defendant's conduct was motivated by legitimate business purposes. *See id.* at 272.

■ The specific intent inquiry, however, cannot be completely subsumed within the second prong of the attempt-to-monopolize test. Unlike the offense of actual monopolization, which requires only a showing of the monopolist's intent to engage in the anticompetitive conduct, an allegation of attempt to monopolize cannot succeed unless the would-be monopolist is shown to have "a specific intent to destroy competition or build monopoly." *Times–Picayune Pub. Co. v. United States*, 345 U.S. 594, 626, 73 S.Ct. 872, 890, 97 L.Ed. 1277 (1953). To permit the specific intent requirement to be satisfied by evidence of anticompetitive behavior—even anticompetitive behavior that creates a dangerous probability of monopolization—would eliminate the difference between the two intent standards.[3]

■ Express evidence of specific intent to monopolize, then, should not be disregarded entirely, although rarely would these statements or memoranda, standing alone, be sufficient to establish the requisite intent, for even an apparently unambiguous declaration of an intention to capture the entire market can be dismissed as "rhetoric and hyperbole." *See Schutt Athletic Co. v. Riddell*, 727 F.Supp. 1220, 1230 (N.D.Ill.1989). Nevertheless, this evidence, when coupled with an anticompetitive act, may indicate a specific intent to monopolize and, although we do not here decide, may, in some circumstances, by itself establish such an intent.

■ As evidence of Rokeach's specific intent to monopolize,[4] Ashkanazy directs this court to the deposition of Rabbi Mordechai Tarkieltaub, the comptroller of Central Kosher from 1982 to 1984, taken in April 1987 during the pendency of the litigation between Mrs. Adler's Foods Corporation and Rokeach and the B. Manischewitz Company. In that deposition, Rabbi Tarkieltaub described several conversations that he witnessed involving Irwin Kralstein, the President and Chief Operation Officer of Rokeach and the President of Central Kosher,[5] in which Kralstein announced that he

3. Professors Areeda and Turner criticize this difference, arguing that proof of intent beyond intent to perform the anticompetitive act "is not part of the completed offense [and] ... should play no role in an attempt offense." That a defendant may be of pure heart and soul, they continue, "tells us little about whether the consequences, actual or prospective, are the kind society need fear." 3 P. Areeda & D. Turner, *supra* p. 7, ¶ 822, at 316. But both Seventh Circuit and Supreme Court precedent recognize a difference between intent for attempt purposes and intent for monopolization purposes. This distinction, moreover, is justifiable: intention to do wrong can more readily be inferred from the performance of bad acts when a firm has actual monopoly power than when it does not. Alternatively, a "strict liability" standard is more appropriate when monopoly status has already been reached, for the effects on competition are less speculative (dangerous probability is not tantamount to certainty).

4. Ashkanazy proffers evidence of specific intent in both the institutional market and the retail market and additionally provides some evidence that applies equally to both markets. Where necessary, we take care to note precisely which market is implicated when discussing each piece of evidence in light of Ashkanazy's claim (and Rokeach's concession for purposes of this motion) that these two markets are separate.

5. Because Ashkanazy only supplied this court with selective portions of Rabbi Tarkieltaub's deposition, the identity of the other parties engaged in these conversations is not clear. It appears from the context, however, that Kralstein was speaking with other officers of Rokeach and/or Central Kosher, and that Rabbi

was "going to try to eliminate him [Mr. Ashkanazy] as being a viable competitor of theirs" (Tarkieltaub Dep. at 61). In further support of his assertion that Rokeach intended to monopolize the kosher-for-Passover market, Ashkanazy offers the deposition of another employee of Central Kosher, Jack Schiff,[6] again taken during discovery in the *Mrs. Adler's* case. Schiff testified that David Eisenbach, the manager of Central Kosher during part of the period in question, "wanted the business from the largest independents in the Chicago area" and was "out point-blank to break Ash" (Schiff Dep. at 20, 165). Speaking to the institutional market, Schiff observed that Rokeach targeted fish as "a main item that [it] want[ed] to keep [Ash] out of" (*id.* at 9) and stated further that Central Kosher officers "constantly told me, do what you have to do to get in the nursing homes, keep them out (*id.* at 32). Although fairly virulent, these statements, without more, do not give rise to a reasonable conclusion that Rokeach intended to monopolize—as opposed to gain a larger share of—the relevant market, and therefore we reserve judgment on the specific intent issue until we consider the evidence of anticompetitive conduct presented by the parties.

2. *Anticompetitive or predatory conduct*

a. *Conduct Common to Both Markets*

(i) *Deceptive Representations*

Ashkanazy alleges in his complaint that one of the techniques undertaken by Rokeach in attempting to secure a monopoly is the publication of "deceptive representa-

tions amounting to unfair acts and practices" designed to persuade Ash's suppliers to discontinue selling to Ash (Complaint ¶ 19(d)). Ashkanazy does not develop this allegation in his memorandum in opposition to Rokeach's summary judgment motion, and it is apparent from the supporting documents filed by Rokeach that this argument has little substance. Although there is evidence that in 1983 David Eisenbach and Jack Kralstein of Rokeach telephoned two of Ash's suppliers—Horowitz–Margareten and Season Products—to inform them that Ashkanazy was very ill (Ashkanazy Dep. at 160–164; Schiff Dep. at 51), Ashkanazy concedes that he was in fact quite sick and that he had been advised by his physician that he had cancer and would live only six months longer (Ashkanazy Dep. at 163–66).[7] Rokeach, then, is guilty of no deception regarding Ashkanazy's illness; certainly Kralstein and Eisenbach could not have known that Ashkanazy would be cured through "Oriental medicine" methods of self-healing (Ashkanazy Dep. at 166).

As an additional illustration of Rokeach's alleged deceptive practices, Ashkanazy asserts, in response to an interrogatory, that "Rokeach executives told Jack Margareten that Rokeach's sales in the Chicago were grossly overestimated" (Ashkanazy Ans. to Int. No. 17). Ashkanazy apparently touched on the same issue in his deposition, charging Rokeach with "quoting one of my suppliers that he—in my opinion exaggerated figures, which David Eisenbach later confirmed to me was overly stated" (Ashkanazy Dep. at 160). Each of these de-

Tarkieltaub was present but did not actively participate.

**6.** The redacted version of Schiff's deposition that Ashkanazy offers this court prevents us from ascertaining the exact position that Schiff held with Central Kosher. It appears, however, that he. was some sort of sales representative.

**7.** Schiff asserts in his deposition that Ashkanazy did not have leukemia (Schiff Dep. at 167), but this statement is not sufficient to raise a material issue on this point. Ashkanazy, the actual patient, testified that he had been told he had "[l]ymphoma, leukemia and [possibly] Hodgkin's disease" (Ashkanazy Dep. at 165), and, given the charge of deceptive representation on

the part of Rokeach, it would not be in Ashkanazy's interest to claim an illness that was not believed to exist. No rational jury could credit Schiff's testimony.

Even if Schiff's statement were considered to raise a material issue and Rokeach's zealous efforts to disseminate the news of Ashkanazy's ill health were exclusionary acts, moreover, these statements had no effect whatever on the vigor of competition in the Kosher-for-Passover market; Ashkanazy admits that neither Horowitz–Margareten nor Seasons Products were induced to drop Ash as a result of Rokeach's revelations (*see* Ashkanazy Dep. at 163, 167). These statements did not, therefore, contribute to any dangerous probability of successful monopolization. *See infra* p. 20.

scriptions of Rokeach's remarks hints at deception, but this court cannot glean exactly what representations were made to whom and therefore what anticompetitive activity Ashkanazy is complaining of; there is no elaboration on these charges in Ashkanazy's memorandum, nor is there any indication of the effects of these allegedly untoward acts. Without further explanation, we cannot consider these remarks to be evidence of anticompetitive behavior.

### (ii) Interference with Contractual Relations

Citing again Rokeach's efforts to publicize the news of Ashkanazy's illness, and asserting additionally that Rokeach successfully induced two suppliers to distribute through Central Kosher in Chicago despite agreements between those suppliers and Ash that established Chicago as Ash's exclusive territory, Ashkanazy accuses Rokeach of interfering with his contractual relations. Assuming without deciding that Rokeach did interfere with a valid exclusive territory agreement, we are not convinced that this behavior rises to the level of anticompetitive behavior. As Professors Areeda and Turner persuasively explain, the effect of a supplier diverting some of his business from Ash to Rokeach is no different if that diversion violates a contractual agreement with Ash than if it does not; in either case, "[t]he competitive effect, if any, results from the transfer of resources or patronage away from the rival and to the monopolist. And that is the essence of competition as long as the inducements are lawful and appropriate." 3 P. Areeda & D. Turner, *supra* p. 7, ¶ 7381, at 286. The only inducement that Ashkanazy has enumerated in support of this claim is the publication of Ashkanazy's illness in 1983, and there is no indication that these representations were unlawful or inappropriate.

### (iii) Pressure on Ash to Raise Prices

In an effort to force Ash to raise prices, Ashkanazy claims in his complaint, Rokeach warned Ashkanazy that his prices

were too low and threatened to put on him a "Jewish curse," apparently a real threat to Ashkanazy in light of his religious and spiritual beliefs. Ashkanazy does not discuss this alleged Jewish curse further, but he does pursue in his memorandum the allegation that Rokeach sought to force Ash to raise his prices. The most incriminating evidence comes from Rabbi Tarkieltaub, who testified that Kralstein and others at Rokeach "attempted to have his [Ashkanazy's] suppliers raise his prices in order that his prices be more in line with what Central Kosher's prices were" (Tarkieltaub Dep. at 61). The targeted supplier, Tarkieltaub reveals, was Horowitz–Margareten.[8] With respect to direct entreaties to Ashkanazy to raise his prices, the evidence is less striking. David Eisenbach, apparently an officer with Central Kosher, asked whether he ever told Ashkanazy to raise his prices, recalled only advising Ashkanazy that he was selling at almost below cost and that he was not making any money (Eisenbach Dep. at 46–47, 106); these statements smack less of pricing coercion than of objective business counseling. Nevertheless, the possibility raised in the Tarkieltaub deposition that Rokeach attempted to manipulate Ash's costs implies an effort to force him to raise prices and suggests anticompetitive behavior. These anticompetitive acts, taken in conjunction with the statements that Rokeach wanted to eliminated Ash from the kosher-for-Passover foods market, may also establish a genuine issue as to specific intent to monopolize.

### (iv) Predatory Pricing

 With respect to both the institutional and the retail market, Ashkanazy alleges that Rokeach engaged in a predatory pricing scheme designed to drive Ash out of the kosher-for-Passover food market and to prevent further entry into that market (Complaint ¶ 19(a)). Predatory pricing, as condemned by the antitrust laws, involves the "deliberate sacrifice of current revenues through lower prices for the pur-

---

**8.** Tarkieltaub actually spoke of "suppliers" in the plural, but his answer to the question "what else" (what other suppliers) was not supplied by Ashkanazy. We therefore only consider this evidence with respect to Horowitz–Margareten.

pose of driving rivals out of the market." *Jays Foods, Inc. v. Frito–Lay, Inc.*, 614 F.Supp. 1073, 1076 (N.D.Ill.1985), *aff'd*, 860 F.2d 1082 (7th Cir.1988), *cert. denied*, 489 U.S. 1014, 109 S.Ct. 1125, 103 L.Ed.2d 188 (1989). To be successful, a predatory pricing scheme must secure for the predator monopoly power to allow recoupment of losses during a sufficiently long period of monopoly pricing. *See American Academic Suppliers, Inc. v. Beckley–Cardy, Inc.*, No. 88 C 2526, 1990 WL 16175 (N.D. Ill. Jan. 31, 1990), *aff'd*, 922 F.2d 1317 (7th Cir.1991). In proscribing this activity, the antitrust laws recognize that price cutting, although usually a blessing to both consumers and competition, can in some instances threaten the continued vitality of competition and ultimately lead to monopoly-level prices. Analysis in this area, then, seeks to distinguish beneficial price cutting from illicit predation; to make this determination, courts compare the price charged by the defendant with the cost of producing the product in question. As a general matter, prices that exceed the relevant cost measure will be deemed to reflect "beneficial aggressive competition" and will exonerate the defendant. *A.A. Poultry Farms, Inc. v. Rose Acre Farms, Inc.*, 881 F.2d 1396, 1400 (7th Cir.1989), *cert. denied*, —— U.S. ——, 110 S.Ct. 1326, 108 L.Ed.2d 501 (1990). On the other hand, below-cost pricing "may reflect a sacrifice in the hope of suppressing competition and collecting a monopoly profit later." *Id.*

Selecting the appropriate measure of cost so that only anticompetitive conduct is condemned, attaining accurate price and cost data, and measuring cost, however, make this inquiry quite complex. *See A.A. Poultry*, 881 F.2d at 1400; *Northeastern Telephone Co. v. American Telephone & Telegraph Co.*, 651 F.2d 76, 86–90 (2d Cir. 1981), *cert. denied*, 455 U.S. 943, 102 S.Ct. 1438, 71 L.Ed.2d 654 (1982) (exploring different theories of cost measures); *Henry v. Chloride*, 809 F.2d 1334, 1345–46 (8th Cir. 1987) (same). Mindful of these hazards, the Seventh Circuit has adopted an approach, its logic rooted in the speculative nature of any predatory pricing strategy, that bypasses the price/cost analysis in many cases and focuses instead on the possibility of recoupment. *See A.A. Poultry*, 881 F.2d at 1401. To the extent that the market conditions are not auspicious for future recoupment, *A.A. Poultry* reasons, courts should not be concerned with suspicious pricing activity for two reasons: first, it can be inferred that prices are not predatory, for no rational economic actor would purposefully price at an unprofitable level if no future gain will compensate for those losses and provide a return on the "investment" of the foregone profits. *See also Matsushita*, 475 U.S. at 588–89, 106 S.Ct. at 1357. Moreover, even if the defendant is pricing below cost, later supracompetitive prices will not endure if recoupment is not possible, and neither consumers nor competition will be harmed. *A.A. Poultry*, 881 F.2d at 1401. *A.A. Poultry* therefore instructs that the existence of predatory pricing, ascertained by comparing price and cost, need only be determined "if market structure makes recoupment feasible." *Id.* Accordingly, we defer discussion of Ashkanazy's allegations of predatory pricing for now, to be picked up when we explore whether Rokeach's actions have created a dangerous possibility of successful monopolization.

### b. Conduct Aimed at Retail Market (i) Price-fixing scheme

A horizontal agreement to control prices in violation of section 1 of the Sherman Act certainly constitutes anticompetitive behavior for the purpose of section 2. Accusing Rokeach of illegal price-fixing behavior, Ashkanazy directs this court to a Wall Street Journal article regarding a federal antitrust investigation in the kosher food industry (Ashkanazy Ex. 16). This article, however, besides being hearsay and not probative of anything, speaks in rather vague terms of "alleged antitrust violations" without ever mentioning the substance of those violations. Moreover, the article merely implies that one of Rokeach's rivals, the B. Manischewitz Company ("Manischewitz"), is implicated in this investigation and contains no reference to Rokeach—or concerted action—whatever. It is quite a stretch, then, to infer from the article that Rokeach and Manischewitz conspired to fix prices.

The record does contain, however, deposition testimony that supports Ashkanazy's allegation. Discussing Central Kosher's gefilte fish pricing practices, Jack Schiff revealed that during the last several months that he worked for Central Kosher, David Eisenbach told him "to drop prices no more against Manischewitz, agreement was reached with Manischewitz on prices of fish" (Schiff Dep. at 32). It appears that this statement was developed through further questioning, but Ashkanazy omits from his exhibit the ensuing testimony; nevertheless, the implication of illegal price fixing remains and is sufficient to preserve for now the issue of whether Rokeach committed any anticompetitive acts with respect to the retail market for kosher-for-Passover foods.

### c. Conduct Aimed at Institutional Market

#### (i) Bribes and Secret Deals

To obtain the patronage of Econocare, Ashkanazy asserts, Rokeach engaged in "a system of bribes and secret dealings" with the president of Econocare, Alan Gluck. Ashkanazy explains in his affidavit that the "secret dealings" consist of "an arrangement ... to distribute [Central Kosher's] private label shampoo and body lotion when Econocare received orders for shampoo and body lotion from its member nursing homes" (Ashkanazy Affidavit ¶ 10).[9] Although Ashkanazy indicates that Gluck could have purchased these goods for less elsewhere, there is no indication that the decision to distribute Central's products was prompted by anticompetitive behavior; spurning lower-priced goods is not necessarily inconsistent with sound business judgment, and Ashkanazy has offered no additional evidence suggesting that an anticompetitive explanation of this behavior is

more plausible. Cf. Matsushita, 475 U.S. at 588, 106 S.Ct. at 1356 ("conduct as consistent with permissible competition as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy" under Sherman Act section 1). Even if the arrangement were illegitimate, moreover, Ashkanazy has not explained how this "secret dealing" has created an unwarranted preference for Rokeach's kosher-for-Passover foods on the part of Econocare.

■ As evidence of bribery, Ashkanazy offers four invoices documenting the delivery of complimentary or reduced-price chicken, wine, champagne, and fruit juice to Gluck's address (Ashkanazy Ex. 21). Indeed, Gluck admitted in his deposition that he occasionally received goods that he personally ordered from Central Kosher for no charge even though he expected—and offered—to pay for them (Gluck Dep. at 81–82). The offense of commercial bribery, however, requires that the benefit be conferred upon an "employee, agent or fiduciary without the consent of the latter's employer or principal, with intent to influence his conduct in relation to his employer's or principal's affairs." Ill.Rev.Stat. ch. 38, § 29A–1 (1989). Gluck is the president and owner of Econocare, Inc. (Gluck Dep. at 4), and as such is incapable of being bribed.[10]

### 3. Dangerous Probability of Success

■ That a defendant engages in "unfair, impolite, or unethical" conduct is not enough to subject him to liability for attempt to monopolize; in addition, the plaintiff must demonstrate that this conduct creates a substantial threat of monopolization. See Indiana Grocery, 864 F.2d at 1413. Because section 2 of the Sherman

---

9. Rokeach asks this court to strike ¶ 10 of Ashkanazy's affidavit on the grounds that it lacks a proper foundation and constitutes hearsay. Because we find Ashkanazy's claim of bribes and secret dealings to be nonmeritorious, however, we decline to rule on this motion.

10. Gluck is certainly the principal with respect to his company, Econocare, and we do not consider the possibility that Gluck and Econocare are fiduciaries of the nursing homes that Econocare serves, for Ashkanazy never raises this ar-

gument. Even if we were to find a fiduciary relationship in this respect, however, there is no showing that Rokeach supplied the free goods in an attempt to influence Econocare's conduct, a necessary element of the bribery offense. Moreover, the record is devoid of evidence indicating that these gifts to Gluck in fact influenced his behavior, and therefore the link between the arguably anticompetitive act and a dangerous probability of achieving monopoly power is lacking. See infra p. 1540.

Act reaches neither monopolization obtained by proper means nor exclusionary conduct that does not threaten monopolization, a violation will only be found where there is a causal link between the anticompetitive behavior and the dangerous probability of success, *cf. A.A. Poultry*, 881 F.2d at 1403; *Lektro–Vend*, 660 F.2d at 272; that is, the specific acts alleged to be improper must make a significant contribution to the power of the defendant and the likelihood that a monopoly will emerge. *See* 3 P. Areeda & D. Turner, *supra* p. 7, ¶ 827, at 320–21.

### a. *Dangerous Probability—Retail Market*
### (i) *Attempt to Force Ash to Raise Prices*

◼ Rokeach's possible attempt to pressure Ash into raising prices could be viewed as seeking to manipulate the price that Ash's suppliers charged and therefore potentially affecting both the retail and institutional markets. We consider first the impact that such efforts will likely have on the retail market. The only supplier targeted by Rokeach in its attempt to increase Ash's costs, Rabbi Tarkieltaub testified, was Horowitz–Margareten, and the evidence indicates that only matzo products were implicated.[11] To the extent that Horowitz–Margareten succumbed to Rokeach's exhortations, there is no evidence that Ash could not purchase matzo products from another supplier at competitive prices. Nor does Ashkanazy demonstrate that increased costs associated with matzo products affected his vitality as a competitor in the kosher-for-Passover food market; because this court has no evidence of the percentage of Ash's sales attributable to matzo products, we are unable to determine the effect that a decrease in Ash's matzo sales would have on his position in the broader market at issue here.

Ashkanazy's claim is most significantly undercut, however, by the complete lack of evidence that any prices on Ash's supplies were actually increased. However malicious Rokeach's intent, and however vociferous its attempts to persuade Horowitz–Margareten to sell to Ash at higher prices, this behavior is not condemned by Sherman Act section 2 unless it contributes to the likelihood that Rokeach will secure a monopoly in the kosher-for-Passover food market. And if the anticompetitive activity is not successful—if Ash's costs are not increased as a result of Rokeach's efforts—Rokeach will be no closer to monopoly than if it kept its nose clean. There is simply no evidence in the record that Horowitz–Margareten raised its prices to Ash in response to Rokeach's pressures. Neither party, apparently, deposed any officer of Horowitz–Margareten; Tarkieltaub's testimony does not speak to the question of whether Rokeach's attempts were successful; and Ashkanazy does not document, either in his deposition or in his affidavit, that Horowitz–Margareten's matzo prices rose at any time during the relevant period. We cannot conclude, therefore, that Ash or competition in general were injured by Rokeach's bid to raise prices. This finding extends also to Rokeach's efforts to increase Ash's costs with respect the institutional market.

### (ii) *Illegal Price Fixing*

◼ Although we found the evidence of price collusion between Manischewitz and Rokeach sufficient to constitute an exclusionary act, it is too limited in scope and in duration to create a dangerous probability of monopolization. The only admissible evidence on this issue was a statement of a Central Kosher salesman indicating that an officer of Central Kosher and Rokeach instructed him in 1984 to cease dropping

---

11. Tarkieltaub's response to the question of what products other than matzo were supplied to Ash by Horowitz–Margareten was not provided to this court:
Q: I don't understand the last part. They attempted to get Mr. Ash to raise his prices?
A: No, Mr. Ash's suppliers.
Q: And who were those suppliers?
A: Horowitz Margareten.
Q: Is that on matzohs?
A: That's on matzoh products.
Q: What else?
[next seven pages omitted] (Tarkieltaub Dep. at 61).
We assume, then, that Rokeach's cost-raising scheme affects only Horowitz–Margareten's matzo products.

prices against Manischewitz in light of an agreement "on prices of fish." Without more, this statement cannot support a conclusion that a monopoly is likely to result from a price-fixing scheme. Although Rokeach and Manischewitz together have 80 to 85% of the relevant retail market (Ashkanazy Dep. at 109), this figure corresponds to the market for kosher-for-Passover foods (including gefilte fish, borscht, canned vegetable soups, and matzo products). By contrast, the price fixing alluded to by Schiff implicates only the retail sale of gefilte fish. Ashkanazy does not allege in his complaint or describe anywhere in its memorandum a submarket of gefilte fish,[12] and even if such a submarket had been established, we have no figures for the combined market share of Rokeach and Manischewitz in that market. Gefilte fish, then, is merely a component of the relevant market in this case. To determine the impact of gefilte fish price collusion on competition in the market at issue here, then, we need to know not only the shares of gefilte fish sales attributable to each of the relevant actors but also the percentage of the kosher-for-Passover food market that is attributable to gefilte fish. Moreover, there is no indication of the duration of the price fixing or even that it occurred. No one has submitted any comparative price data, so we do not know what price parallelism, if any, there may have been. A temporary intention to end a price war between competitors, for example, does not imply the sort of price coordination that would likely inhibit competition. Without evidence of the market share created by the alleged price fixing and the length of time that the rivals colluded, there is no basis to conclude that this illegal activity created a dangerous possibility of Rokeach monopolizing the kosher-for-Passover food market.

### (iii) Predatory Pricing.

■ As explained *supra*, analysis of a claim that the defendant engaged in predatory pricing begins with a determination of whether the relevant market structure makes recoupment of the losses endured during the period of below-cost pricing possible—that is, whether the defendant can eliminate rivals from the market and keep them out.[13] The predatory pricing scheme asserted with respect to the retail independent market is quite confined; it spans only the Passover seasons of 1983 through 1986 and extends only to five independent retailers: Tel Aviv Supermarket, Milk Pail, Hungarian Sausage and Supermarket Company, New York Kosher, and Kosher City (Ashkanazy Ans. to Int. No. 9). The products implicated are gefilte fish, matzo products, borscht, and Passover bakery products (*id.*).[14]

The very limited nature of the alleged predatory-pricing scheme alone seems to doom it to failure. Leaving aside the fact that the scheme involved only three of the four components of the kosher-for-Passover food market (canned vegetable soups apparently were not implicated, and Passover bakery products fall outside the purview of this action), the noncomprehensive pattern of predation could not reasonably have been thought to force competitors out of the market. Rokeach's predatory-pricing scheme targeted five retail independent

---

**12.** In an affidavit and report compiled in connection with the *Mrs. Adler's* litigation, Professor Mueller of the University of Wisconsin economics department defines gefilte fish as an independent market. This representation has no bearing on the current litigation, however, in which no specific submarket has been identified.

**13.** In *American Academic Suppliers,* the Seventh Circuit announced that recoupment is not possible unless the defendant has monopoly power, which the court defined as "the power to charge a price higher than the competitive price without inducing so rapid and great an expansion of output from competing firms as to make the supracompetitive price untenable." At 1319.

The context and subsequent discussion make clear, however, that the court envisions an inquiry not only into whether the predator can keep rivals out during the period of supracompetitive pricing but also into whether the predator's below-cost pricing will eliminate rivals from the market.

**14.** A second interrogatory, Number 11, touches on the subject of the predatory pricing scheme alleged in ¶ 19(a) of Ashkanazy's complaint, but Ashkanazy's response to that interrogatory is limited to the institutional context. *See infra* p. 1545 & n. 19. Ashkanazy's answer to Interrogatory Number 9, then, represents the extent of the alleged predatory pricing with respect to the retail independent market.

stores in the relevant geographic area; by contrast, Ash has sold to twenty-four in the same area since 1983. Even assuming Ash's customers to complete the universe of independent stores selling kosher-for-Passover products, the number of stores included in Rokeach's scheme appears to be insufficient to wreak the sort of economic havoc on its competitors that would drive them from the market. To the extent that Ash and Manischewitz and other potential rivals were foreclosed from the five targeted stores, nineteen stores remained for them in which they could freely compete for business. It strikes this court as highly improbable that such a limited strategy of price cutting could be expected to ruin competitors and secure a monopoly for Rokeach; rivals would therefore remain free to reenter the foreclosed part of the market as soon as Rokeach started the recoupment stage of its predatory pricing scheme. *See American Academic Suppliers*, at 1320–21.

The structure of the retail independent market underscores the futility of the plan. In his complaint, Ashkanazy alleges Rokeach's share of the kosher-for-Passover food retail market to be 40%, and Rokeach accepts this estimation for the purpose of this motion. Pointing to the deposition testimony of David Eisenbach, Ashkanazy amends that figure to 70%, which Rokeach persuasively contests. To be sure, in both of the cited passages Eisenbach mentioned a 70% share, but a quick examination of the testimony reveals that in neither case was Eisenbach referring to Rokeach's share of the independent retail market in kosher-for-Passover foods; at page 18 of the deposition, Eisenbach was clearly estimating the percentage of Central Kosher's retail sales to independent as opposed to chain stores, and at page 100, Central Kosher's share of sales of gefilte fish to retail independents was discussed. The only proffered figure with any support in the record, then, is the 40% estimation originally asserted (*see* Ashkanazy Dep. at 109).

The measured percentage of Rokeach's market share, Ashkanazy additionally asserts, understates its market power in light of the evidence of price collusion between Rokeach and Manischewitz, who Ashkana-

zy claims accounts for 45 to 50% of the retail independent market (Ashkanazy. Dep. at 109). As explained *supra*, however, this price fixing implicates only gefilte fish, and we are unable to assess the effect of this scheme on Rokeach's constructive share of the kosher-for-Passover food market without additional evidence. Recouping losses associated with predatory pricing, moreover, requires that a predator be able to charge monopoly prices for an extended period of time following the period of below-cost pricing. The allegation of price fixing refers only to 1984; there is no corroborating evidence of deliberate parallel pricing, whether persisting through the pendency of the predatory-pricing scheme (1983–1986) or continuing after its conclusion (1987 to present). Such data, we note, would not have been unduly difficult to compile—Ashkanazy needed only to compare Ash's gefilte fish prices with Manischewitz's from 1984 to present. Evidence of price coordination in 1984, if it existed, has no bearing on the possibility of recouping losses associated with a predatory-pricing scheme that continued until 1986. For the purpose of this inquiry, therefore, we conclude that Rokeach's share of the relevant market is 40%.

Rokeach's share therefore exceeds the 30% mark that has frequently been pronounced insufficient as a matter of law to confer market power. *See A.A. Poultry*, 881 F.2d at 1403 (citing cases). But even higher market shares may not trigger antitrust concern if mitigating factors, such as low entry barriers, are present. *See Ball Memorial Hospital, Inc. v. Mutual Hospital Insurance, Inc.*, 784 F.2d 1325, 1335 (7th Cir.1986); *Empire Gas*, 537 F.2d at 305; *Schutt Athletic*, 727 F.Supp. at 1231. Assuming *arguendo* that Ash, the smallest of Rokeach's rivals in the retail independent market with 15% of the market, could reasonably be expected to be forced out as a result of the predatory pricing scheme, monopoly pricing would not be sustainable. Manischewitz, a national concern with a 45 to 50% share of the Chicago area retail independent market, competes with Rokeach in both the retail independent and the retail chain markets, and even if it were

forced to leave the independent market because of Rokeach's below cost prices, it would remain a potential competitor in that market and would grasp the opportunity of supracompetitive prices to regain its market position.

In addition to Manischewitz's commanding presence as an enforcer of a competitive pricing structure, there is no indication that high entry barriers would prevent new rivals from entering the market to compete with Rokeach. In attempting to create an issue of fact on the question of entry barriers, Ashkanazy borrows from the *Mrs. Adler's* litigation Professor Mueller's report attesting to high barriers to entry in the gefilte fish and matzo markets. Relying only on this evidence, Ashkanazy ignores two of the four products that are included in the relevant market. More significantly, this report, geared in part to the particular requirements of the *Mrs. Adler's* case, speaks to barriers of entry that may frustrate potential *producers* of matzo meal and gefilte fish. By contrast, a viable rival in this case could fashion itself after Ash and would require only a supplier,[15] warehouse space, a telephone, and a car to compete (*see* Ashkanazy Dep. at 22–23). A potential competitor, then, does not need to build new productive assets or accumulate a significant amount of initial capital to enter the market; even alone in the market, then, Rokeach's control over prices would be seriously restricted. *See Ball Memorial Hospital,* 784 F.2d at 1335; *C.A.T. Industrial Disposal, Inc. v. Browning–Ferris Industries,* 884 F.2d 209, 211 (5th Cir.1989). Rokeach's pattern of below-cost pricing, Ashkanazy alleges, lasted from 1983 to 1986. Three to four years of suffering losses would require a substantial period of supracompetitive prices to permit recoupment, *see American Academic Suppliers,* at 1320–21, affording potential rivals a significant window of opportunity for entrance and rendering the success of Rokeach's scheme highly unlikely.

The predatory pricing scheme that Ashkanazy alleges had been completed for nearly three years at the time this motion was filed. Although Sherman Act section 2's proscription of attempt to monopolize penalizes the attempt itself and does not require that a monopoly in fact ensue, subsequent market performance, while not conclusive, is useful in evaluating the defendant's "capacity to monopolize at the time of the supposed attempts." *Lektro–Vend,* 660 F.2d at 271. Indeed, in *A.A. Poultry,* the Seventh Circuit appears to explore not only whether recoupment was possible but also whether it in fact occurred. *See* 881 F.2d at 1403–04 (concluding that "no rational jury could have found that recoupment took place, could have taken place, or conceivably could take place in the future"). We therefore turn to an evaluation of the retail independent market structure during the period of alleged recoupment, 1987 to present.

We note initially that Ashkanazy has offered no evidence suggesting that Rokeach now has a larger market share than it did before it undertook the predatory pricing scheme or that pre–1983 competitors have been eliminated from the market. The market share figures (40% Rokeach, 45–50% Manischewitz, and 15% Ash) are provided without any temporal indication and are not compared with other figures corresponding to earlier or later dates. Without updated calculations, we must assume that the market shares of the main actors in the retail independent market have remained constant.

In particular, Ashkanazy himself, while complaining of improper behavior, appears to be no less hearty a competitor now than he was before 1983. He claims in his affidavit that his unit sales have decreased by 50%, but there is no indication that this decline represents an eroding market position; Ashkanazy does not provide corresponding information about the growth of unit sales market wide. Indeed, there is no

**15.** Professor Mueller identifies three potential suppliers for Kosher-for-Passover food other than Rokeach and Manischewitz: Mrs. Adler's, Streit's, and Horowitz–Margareten (Mueller Rep. at 8). Although the latter was acquired by Manischewitz in 1986, Ashkanazy indicates that he continues to buy Horowitz–Margareten products from Manischewitz (Ashkanazy Aff. at ¶ 3(a)).

indication that Ash's market share has declined or that he now sells to fewer independent stores than he did pre–1983. Ash's profits on kosher foods [16] have remained fairly constant since 1980 despite his assertion that in 1983–88 he realized a profit of 2% each year, a return 10% lower than the "normal" level (Ashkanazy. Aff. ¶ 16). Ashkanazy's claim of a 12% normal net profit is not credible in light of Rokeach's calculations, which are based on Ashkanazy's tax returns and his claim that approximately 50% of his profits are attributable to kosher food sales.[17] Thus in 1980, Ashkanazy realized $4732 on $191,150 of kosher sales, resulting in a net profit of 2.4%. Similar calculations yield a 1.8% return in both 1981 and 1982. That Ash is a less viable competitor today than he was before Rokeach instituted its predatory-pricing scheme, then, is not supported by the record.

Nor is Ashkanazy's evidence that Rokeach is now recouping losses by supracompetitive pricing believable. Ashkanazy bases its argument on several charts documenting the price increases from 1983 to 1987 on various sizes of gefilte fish; the percentage increase is then compared to the 1989 World Almanac's report of the Consumer Price Index annual percentage change for food items. The numbers provided by Ashkanazy are incapable of demonstrating supracompetitive pricing, however, because they are not compared to the costs associated with producing the gefilte fish for those years. We cannot simply infer that the cost increases were average and that any price increase above the average level for all food items reflects a monopoly. Production of kosher-for-Passover food is characterized by many idiosyncracies regarding the raw materials, the labor force, and the manufacturing process; a slight change in the supply of any of these production ingredients can have a significant impact on the cost of manufacturing.

It strikes this court as unfathomable, moreover, that recoupment could now be taking place, for Manischewitz and Ash are still competing in the retail independent market. Indeed, in a May 1987 deposition, Ashkanazy testified that he had no plans to expand his business because his overhead would surpass his profits and he would realize no gain (Ashkanazy Dep. at 33).[18] Certainly if retail independent prices were at supracompetitive levels, Ashkanazy would not hesitate to increase his sales to the full extent possible.

Our review of the record leads us to conclude that Ashkanazy has been unsuccessful in his bid to create a genuine issue of fact on the question of whether recoupment took place, could have taken place or possibly will take place, and, accordingly, our analysis of the predatory pricing claim need not go any further. Because the remaining acts that we found to be plausibly anticompetitive unquestionably could not create a dangerous possibility of monopolization, we grant Rokeach's summary judgment motion with respect to Ashkanazy's claim that Rokeach attempted to monopolize the retail independent market.

b. *Institutional Market*
(i) *Predatory Pricing*

With respect to the institutional market, Ashkanazy has again, in his an-

---

**16.** Although Rokeach's calculations of Ashkanazy's pre–1983 net profit level encompass all Kosher foods, not only the Kosher-for-Passover foods at issue here, Ashkanazy's estimation in his affidavit documenting decreasing unit sales appears to take all of his sales into consideration, which would include "sundry items" (*see* Ashkanazy Dep. at 12). Both figures are therefore imperfect for the purposes of this action, but the affidavit data is even more overinclusive.

**17.** Ashkanazy originally stated that ⅔ of his 1980 profits were attributable to Kosher sales, but he backed away from this figure upon further questioning (Ashkanazy Dep. at 519–21).

**18.** This deposition testimony is contradicted by a statement in Ashkanazy's affidavit claiming that he had the "ability and the interest to expand in the Kosher for Passover market and still keep up reasonable profit margins" (Ashkanazy Aff. ¶ 6). Because Ashkanazy has not shown that he was confused when he made the deposition statement or that he has uncovered new evidence that accounts for the change in position, we must disregard the contradicting affidavit. *See Rubin v. Rudolf Wolff Commodity Brokers, Inc.,* 636 F.Supp. 258, 262 (N.D.Ill. 1986).

swer to Rokeach's interrogatories, limited the scope of Rokeach's alleged predatory pricing. Rokeach practiced below-cost pricing, Ashkanazy claims, with respect to "Passover institutional items which Rokeach purchased and even picked up from Plaintiff" (Ashkanazy Ans. to Int. No. 11). These products were sold below cost to "[i]nstitutions such as Sheridan Gardens Nursing Homes, Ambassador Nursing Home, [and] Buckingham Nursing Home" (id.).[19] There is no durational limitation, however, and although only three nursing homes are explicitly mentioned, the list is clearly not meant to be exhaustive; the "institutions such as" language suggests that the named homes are merely illustrative.

Ashkanazy's description of the products implicated by the predatory pricing scheme, however, is not capable of an expansive interpretation and is fatal to his predatory pricing claim. Nowhere in Ashkanazy's complaint, memorandum, or exhibits, does he quantify the percentage of Rokeach's sales that involve products purchased from Ash; yet those products represent the extent of the alleged predatory pricing in the institutional market. Indeed, Ashkanazy's absolute silence on this issue, both on the buying end (no indication that Rokeach bought any products from Ash) and on the selling end (Ashkanazy never mentions Rokeach as a customer) suggests that these sales are extremely insignificant. The complete lack of evidence regarding the significance of these products to Rokeach's overall sales to institutions prevents us from determining whether the predatory pricing scheme could eliminate Ash as a competitor and permit the recoupment of losses. Even if products purchased from Ash constituted a significant part of Rokeach's sales to institutions, Ashkanazy's response to the interrogatory asserts that Rokeach resold these products at a 10 to 15% markup. Whether or not the prices on these goods were exceeded by costs, these sales would never successfully eliminate Ash as a competitor because the prices are necessarily set at levels above the cost at which Ash can profitably sell.

We recognize that Rokeach's market share is quite high—Ashkanazy has alleged a 75 to 80% market share attributable to Rokeach, with Ash accounting for the remaining 20%, and Rokeach does not contest these figures—and that entry barriers may exist in light of the presence of Econocare, a group purchasing agent servicing institutions in the relevant market. But these factors are not relevant if Rokeach cannot secure a monopoly in the institutional market, see *Indiana Grocery*, 864 F.2d at 1415, and it is unquestionably implausible that the limited predatory pricing scheme at issue here could gain for Rokeach a larger piece of the market than it currently has. Despite the perplexing nature of Ashkanazy's description of the predatory pricing scheme in the institutional market, this court is bound by it. Accordingly, we are compelled to conclude that Ashkanazy has failed to meet his burden of producing evidence of the economic plausibility of the asserted predatory pricing in the institutional market.

## B. *Robinson–Patman Act Violations*

In making out a claim against Rokeach on Robinson–Patman grounds, Ashkanazy alleges violations of section 2(a) of the Clayton Act, as amended by the Robinson–Patman Act, which prohibits direct discrimination in the price of like goods sold to different purchasers, as well as of sections 2(d) and (e), which forbid indirect price discrimination in the form of promotional payments or allowances. Section 2(a) provides, in relevant part:

It shall be unlawful for any person engaged in commerce, in the course of such commerce, either directly or indirectly, to discriminate in price between different purchasers of commodities of like grade and quality, where either or any of the

---

19. Rokeach's Interrogatory Number 9 also seeks information about the predatory pricing scheme alleged in ¶ 19 of the complaint, but Ashkanazy's response there refers only to Rokeach's pricing policies in the retail market. *See supra* p. 1541 & n. 14. The response to Interrogatory Number 11, therefore, defines the limits of the alleged predatory pricing scheme in the institutional market.

purchases involved in such discrimination are in commerce ... and where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them....

15 U.S.C. § 13(a) (1988). Disgruntled competitors both of the discriminator-defendant and of his favored buyers may challenge price discrimination under this provision. Ashkanazy is apparently asserting his section 2(a) claim in his capacity as a competitor of Rokeach—a claim of "primary-line injury"—for there is no indication in the complaint or in subsequent filings that Ash uses Rokeach as a supplier (although there is a suggestion that Rokeach may purchase some goods from Ash). Where a primary-line injury is alleged, a plaintiff makes out a prima facie case of a violation if he can show (1) that section 2(a)'s three "in commerce" tests are satisfied; (2) that he is in competition with the defendant; (3) that different prices were charged to different customers for the same goods; and (4) that there is "a reasonable possibility that [this discrimination] may harm competition." *Falls City Industries, Inc. v. Vanco Beverage, Inc.*, 460 U.S. 428, 434–35, 103 S.Ct. 1282, 1288, 75 L.Ed.2d 174 (1983). Rokeach urges dismissal of Ashkanazy's Robinson–Patman claim on the grounds that Ashkanazy cannot establish the first and fourth of these requirements.

### 1. *The "in Commerce" Requirement*

■ As a jurisdictional matter, section 2(a) is triggered only upon the satisfaction of three different "in commerce" [20] tests: "first, the discriminator must be 'in commerce'; second, the challenged discrimination must occur 'in the course of such commerce'; and third, 'either or any of the

purchases involved in such discrimination [must be] in commerce.'" *Mayer Paving & Asphalt Co. v. General Dynamics Corp.*, 486 F.2d 763, 766 (7th Cir.1973), *cert. denied*, 414 U.S. 1146, 94 S.Ct. 899, 39 L.Ed.2d 102 (1974). The third of these inquiries encompasses the first two, *see* 1 P. Areeda and D. Turner, *Antitrust Law* ¶ 233c, at 248 (1978); *cf. Mayer Paving*, 486 F.2d at 766, and therefore it comes as little surprise that Rokeach focuses exclusively on the third test in its motion for summary judgment.

■ The purview of section 2(a)'s "in commerce" provision is much narrower in scope than the Sherman Act's jurisdictional requirement, which is satisfied whenever interstate commerce is affected. *See Gulf Oil Corp. v. Copp Paving Co.*, 419 U.S. 186, 95 S.Ct. 392, 42 L.Ed.2d 378 (1974) (rejecting the "nexus to commerce" standard for section 2(a) of the Robinson–Patman Act). By contrast, section 2(a) applies only if "at least one of the two transactions which, when compared, generate a discrimination" crosses a state line. F. Rowe, *Price Discrimination Under the Robinson–Patman Act* 79 (1962). Where, as here, the plaintiff-victim is a competitor of the defendant-discriminator—so-called "primary-line injury" cases—an interstate sale in either the victim's market or in the market where the defendant is allegedly charging lower prices will satisfy the jurisdictional requirement. *See* 1 P. Areeda & D. Turner, *supra*, ¶ 233c, at 249; *Moore v. Mead's Fine Bread Co.*, 348 U.S. 115, 75 S.Ct. 148, 99 L.Ed. 145 (1954) (jurisdiction found despite the intrastate nature of the sales in the victim's market where "the beneficiary is an interstate business; the treasury used to finance the warfare is drawn from interstate, as well as local, sources ...; and the prices on the interstate sales ... are kept high while the local prices are lowered").[21] The nature of the

---

**20.** The term "commerce," for the purposes of the Robinson–Patman Act, connotes interstate commerce. *See Borden Co. v. Federal Trade Comm'n*, 339 F.2d 953, 955 (7th Cir.1964).

**21.** By contrast, if the victim is a disfavored buyer of the defendant's goods, alleging a sec-

ondary-line injury, the "in commerce" inquiry is limited to an examination of "the defendant's sales to the victim and the victim's competitors." 1 P. Areeda & D. Turner, *supra* p. 1546, ¶ 233c, at 248–49.

victim's sales in primary-line injury cases, therefore, is irrelevant; a plaintiff may allege a section 2(a) violation even if his business transactions are limited to intrastate sales. *See Moore's*, 348 U.S. at 119, 75 S.Ct. at 150.

■ It appears that Rokeach's products are sold out of New Jersey[22] while the discriminatory sales of which Ashkanazy is complaining involved purchases made in Illinois. Rokeach claims, however, that its goods "come to rest in Illinois, a mark-up is added, and then they are sold" (Defendant's Memorandum at 17); without developing the theory, Rokeach is apparently arguing that the allegedly discriminatory sales originated in Illinois because the products are stored there temporarily. But mere local storage of goods that originate out of state does not necessarily interrupt the "economic continuity" of the interstate transaction, *Zoslaw v. MCA Distributing Corp.*, 693 F.2d 870, 877, 879 (9th Cir.1982), *cert. denied*, 460 U.S. 1085, 103 S.Ct. 1777, 76 L.Ed.2d 349 (1983), and therefore does not nullify the interstate nature of those sales. *See Standard Oil v. Federal Trade Comm'n*, 340 U.S. 231, 237–38, 71 S.Ct. 240, 243–44, 95 L.Ed. 239 (1951) (despite temporary local storage of gasoline in Michigan, the "flow of the stream of commerce" surged continuously from Indiana to Detroit); *Bargain Car Wash, Inc. v. Standard Oil Co.*, 466 F.2d 1163, 1166 (7th Cir.1972).[23]

■ Nor is it relevant, on this motion for summary judgment, that the goods are distributed in Chicago not by Rokeach itself but by a distributing subsidiary, Central Kosher. Although Rokeach did not own all of Central Kosher's stock at the time of the alleged violations,[24] Rokeach has accepted responsibility for Central Kosher's actions for the purposes of this motion, admitting provisionally that "the actions of Central Kosher are attributable to Rokeach, and that Rokeach competes in Chicago through Central Kosher" (Defendant's Memorandum at 4 n. 2). Even without this concession on the part of Rokeach, however, its bifurcated sales system would not necessarily remove the sales from commerce. Only if the goods are ultimately sold by "franchised distributors or bona fide independent subsidiaries" can Robinson–Patman jurisdiction be avoided. *See F. Rowe, supra* p. 1546, at 81; *Hiram Walker, Inc. v. A & S Tropical, Inc.*, 407 F.2d 4, 9 (5th Cir.), *cert. denied*, 396 U.S. 901, 90 S.Ct. 212, 24 L.Ed.2d 177 (1969). If it can be shown that the parent actively controls the subsidiary, the subsidiary's sales will be imputed to the parent, *see Acme Refrigeration, Inc. v. Whirlpool Corp.*, 785 F.2d 1240, 1243 (5th Cir.), *cert. denied*, 479 U.S. 848, 107 S.Ct. 171, 93 L.Ed.2d 108 (1986), and the intervention of the distributing subsidiary will not interrupt the flow of commerce. To assess the independence of the subsidiary, a question of fact, courts look to how much control the parent exerts over the subsidiary's pricing and marketing decisions. *See Zoslaw*, 693 F.2d at 880; *Taggart v. Rutledge*, 657 F.Supp. 1420, 1439 (D.Mont.1987), *aff'd*, 852 F.2d 1290 (9th Cir.1988). The evidence before this court—and especially the deposition of Rabbi Mordechai Tarkieltaub, Central Ko-

---

**22.** In his memorandum in opposition to Rokeach's motion, Ashkanazy offers New Jersey as the point of origin of Rokeach's goods but does not refer to any evidence directly supporting this assertion. Nevertheless, we accept this representation, for Rokeach does not claim that the point of origin of its goods is in dispute and indeed admits that its products are sold in interstate commerce (Answer to Complaint ¶ 12) and that its principal place of business is in New Jersey (Halpert Affidavit ¶ 3).

**23.** The goods at issue in *Standard Oil* were stored in anticipation of ultimate demand in Michigan, which was fairly constant and could be accurately estimated; there is some indication that this correlation between goods stored and future orders was a factor in the Court's conclusion that the flow of commerce was not interrupted. But even if storage for general inventory purposes defeats a claim of an interstate transaction, Rokeach has not clearly asserted that its goods were stored for general inventory purposes in Illinois and certainly has adduced no evidence supporting such an assertion.

**24.** Until July, 1989, when Rokeach gained control of all of Central Kosher's outstanding stock, Rokeach owned 60% of the voting stock of Central Kosher and 50% of the ownership stock.

sher's Comptroller between 1982 and 1984[25]—certainly documents a sufficient factual dispute on the issue of independence to prevent us from ruling on it at this time.

### 2. *The Injury to Competition Requirement*

In the Seventh Circuit's most recent pronouncement on price discrimination, Judge Easterbrook, rejecting the argument that the standard for injury to competition under the Robinson–Patman Act is coextensive with the standard for liability for predatory pricing under the Sherman Act, held that lower federal courts must follow the approach of the Supreme Court's *Utah Pie* opinion in assessing whether the discrimination at issue poses a sufficient threat to competition. *See A.A. Poultry,* 881 F.2d at 1404–05 (invoking *Utah Pie Co. v. Continental Baking Co.,* 386 U.S. 685, 87 S.Ct. 1326, 18 L.Ed.2d 406 (1967)). *A.A. Poultry,* however, fails to articulate clearly the precise *Utah Pie* mandate that must be obeyed; Judge Easterbrook writes merely that *"Utah Pie* holds that the Robinson–Patman Act condemns at least some primary-line price discrimination that the Sherman Act permits." 881 F.2d at 1405. Beyond that statement, he simply refers to factors on which the *Utah Pie* Court relied in determining that the jury in that case had been justified in finding illegal price discrimination. *See* 881 F.2d at 1404 ("price discrimination in an oligopolistic market contributing to the erosion of price levels *may* violate the statute") (emphasis added); *id.* at 1406 (*"Utah Pie* ... recited that 'predatory intent' coupled with 'unreasonably low prices' *may* be the basis of liability") (emphasis added); *id.* (*"Utah Pie* held that the firm taking the lead in reducing prices *may* be liable on account of a 'drastically declining price structure' in a

'highly competitive' market") (emphasis added); *id.* ("a few references in *Utah Pie* imply that the relation between price and cost matters" (citations omitted)). *Utah Pie* does not give any of these factors dispositive weight, however, and certainly does not form around them a rigid test to assess the effects on competition. *See The Supreme Court, 1966 Term—Leading Cases,* 81 Harv.L.Rev. 112, 242 (1967). To apply the holding of *Utah Pie,* then, we must examine exactly what that case requires.

After canvassing the evidence of illegal price discrimination adduced with respect to each of the three defendants, the *Utah Pie* Court discussed in more general terms the scope of activity that Congress intended to deter in passing the Robinson–Patman Act. 386 U.S. at 702–03, 87 S.Ct. at 1335–36. In categorical terms, the Court observed that cases involving blatant predatory price discrimination "present courts with no difficulty, for such pricing is clearly within the heart of the proscription of the Act." 386 U.S. at 702, 87 S.Ct. at 1335. Predatory intent, the Court continued, "might bear on the likelihood of injury to competition," *id.;* this language apparently prompted *A.A. Poultry* to hold that although predatory intent has no place in Sherman Act section 2 analysis, it is an appropriate consideration in Robinson–Patman inquiries. It appears, however, that the Supreme Court in *Utah Pie* found evidence of subjective intent useful not for the purpose of evaluating the propriety of the price discrimination directly but rather for inferring whether a particular price structure is predatory. *See id.* at 696 n. 12, 87 S.Ct. at 1332 n. 12 (" 'if one engages in [predatoriness], a reasonable probability may be inferred that its willful misconduct may substantially lessen, injure, or prevent competition.' " (quoting *Anheuser–Busch,*

**25.** Rabbi Tarkieltaub testified that Rokeach bought Central Kosher so that it could do its "own distributions as opposed to having somebody else independent of them distribute their products" and that he had no authority over pricing decisions, which were made by Irwin

Kralstein (Tarkieltaub Dep. at 26–27, 29). Central Kosher, Tarkieltaub continued, did what Rokeach decided it should do; indeed, officers of Rokeach visited Central Kosher's headquarters on average twice monthly to set prices and "[t]o tell us what to do" (*id.* at 30).

*Inc. v. Federal Trade Comm'n,* 289 F.2d 835 (7th Cir.1961)) ... " '[K]nowledge of actual intent is an aid in the interpretation of facts and prediction of consequences.' " (quoting *Appalachian Coals v. United States,* 288 U.S. 344, 372, 53 S.Ct. 471, 478, 77 L.Ed. 825 (1933)). The thrust of the Supreme Court's holding, then, is that predatory pricing is the end evil to be rooted out; an alternate means of proving predatory conduct would therefore not be inconsistent with *Utah Pie.*

When read in conjunction with more recent Supreme Court cases discussing the predatory pricing issue, moreover, *Utah Pie* may be read to discourage the use of direct evidence of predatory intent.[26] The Supreme Court appears to have abandoned the use of predatory intent to determine illegal predatory conduct in *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), in which the Court emphasizes the importance of ascertaining whether the alleged predator has any rational motive to act predatorily, determined by the economic plausibility of ultimately recouping the losses incurred during the period of predatory pricing. *Matsushita* suggests that, even in the presence of predatory intent as documented by direct evidence, summary judgment in favor of the defendant-predator may be warranted if he can demonstrate a lack of a rational economic motive to engage in a predatory pricing scheme. *See Henry,* 809 F.2d at 1345. *Utah Pie,* we repeat, condemns predatory intent because it reflects the presence of

predatory conduct rather than because it is an evil in itself; the *Matsushita* approach to predatory pricing analysis, which suggests that other considerations are more reliable indicators of predatory pricing and are therefore preferred to predatory intent, amplifies and supplants the *Utah Pie* approach to predatory pricing under the Robinson–Patman Act. We do not believe that *A.A. Poultry* decides otherwise.[27]

■ In discussing methods of proof of predatory price discrimination, *Utah Pie* refers not only to direct evidence of predatory intent but also to indirect evidence based on "surrounding economic circumstances, which would include persistent unprofitable sales below cost and drastic price cuts themselves discriminatory." 386 U.S. at 696 n. 12, 87 S.Ct. at 1332 n. 12. Below-cost sales is considered by contemporary commentators and courts to be a valid indicator of predatory conduct, *see A.A. Poultry,* 881 F.2d at 1400–01; Areeda & Turner, *Predatory Pricing and Related Practices Under Section 2 of the Sherman Act,* 88 Harv.L.Rev. 697 (1975), and must be considered by courts in this circuit if the market structure makes recoupment of lost profits feasible. *See A.A. Poultry,* 881 F.2d at 1401. Subsequent Supreme Court opinions, however, espouse the view that an inquiry into predatory conduct should, if possible, focus initially on the feasibility of recoupment. *See Cargill, Inc. v. Monfort of Colorado, Inc.,* 479 U.S. 104, 107 S.Ct. 484, 93 L.Ed.2d 427 (1986); *Matsushita,* 475 U.S. 574, 106 S.Ct. 1348. We therefore

---

**26.** Direct evidence of predatory intent comprises "smoking gun"-type proof, such as statements and letters that expressly document malevolent purpose. *See Henry,* 809 F.2d at 1344. Predatory intent may also be proved indirectly from the defendant's conduct (extended unprofitable pricing) and the surrounding circumstances (high concentration and entry barriers). *See id.; W.H. Brady,* 659 F.Supp. at 1377.

**27.** *A.A. Poultry* clearly does hold that the primary-line liability standard for predatory pricing under the Robinson–Patman Act is broader than the Sherman Act standard, without attempting precisely to delineate the difference. This court expressed a contrary view in *Jays*

*Foods, Inc. v. Frito-Lay, Inc.,* 656 F.Supp. 843 (N.D.Ill.1987), which opinion was affirmed and adopted by the Seventh Circuit in an unpublished order. 860 F.2d 1082 (7th Cir.1988), *cert. denied,* 489 U.S. 1014, 109 S.Ct. 1125, 103 L.Ed.2d 188 (1989). We do not know whether "adoption" of a published district court opinion by an unpublished order puts it on a special footing or whether it carries no more weight than a lower court decision that, for whatever reason, has been affirmed. *See Estate of Warner v. United States,* 743 F.Supp. 551, 556 (N.D. Ill.1990). We do know it was not cited in *A.A. Poultry,* and the *A.A. Poultry* opinion was not circulated pursuant to Circuit Rule 40(f).

believe that the threshold determination of the economic plausibility of a predatory pricing scheme should be included in predatory pricing analysis under *Utah Pie* and should end the inquiry if market conditions are not found to support the economic rationality of predatory behavior. Indeed, this inquiry logically fits in the "surrounding economic circumstances" analysis specifically called for by *Utah Pie.*

If a study of the market reveals that recoupment may be possible, a court must then examine the relationship between the defendant's price and costs. *A.A. Poultry* attributes to *Utah Pie* a conception of below-cost pricing that draws on the "average total cost rather than [the] variable or marginal costs." 881 F.2d at 1406. It refers, however, to *Matsushita's* footnote 8, in which the Court specifically declined to decide what "cost" is relevant, and a decision on that point was also unnecessary in *A.A. Poultry.* Indeed, any conclusion that pricing below average total cost could violate the Robinson–Patman Act would have to be based on a mere reference in *Utah Pie* that one of the defendants priced below "its direct cost plus an allocation for overhead." 386 U.S. at 698, 87 S.Ct. at 1334. There is no indication that the Court understood this evidence to suggest "below-cost pricing" for purposes of inferring predatory intent; indeed it found the defendant liable under the Robinson–Patman Act not because of any documented predatory intent but because of the impact of the defendant's lower prices on competition as determined through market analysis. *See* 386 U.S. at 699–700, 87 S.Ct. at 1334–35. Moreover, the Court, in setting forth possible indirect methods of proof of predatory intent, referred to *unprofitable* sales below cost, 386 U.S. at 696 n. 12, 87 S.Ct. at 1332 n. 12, and, at least in the short run, profits are maximized by pricing *below* average total cost. *See* Areeda & Turner, *supra* p. 1549, at 701–02. Even if the *Utah Pie* Court did consider average total cost to be the relevant cost measure at that time, its concern, again, was to root out predatory pricing, and therefore more reliable

measures of cost developed subsequently can (and should) be substituted without upsetting the holding or reasoning of *Utah Pie.*

By the same reasoning, "drastic price cuts themselves discriminatory" should not be considered sufficient alone to give rise to an inference of predatory conduct. It is unclear that *Utah Pie* even understood this concept to be an independent indicator of predatory intent; the Court, in including this language, may have meant that drastic price cuts, *coupled with* persistent unprofitable sales, suggest predation. Indeed, all of the sources that the Court cites in support of its examples of "surrounding economic circumstances" speak to *below-cost* price reductions. *See* 386 U.S. at 696 n. 12, 87 S.Ct. at 1332 n. 12.

In practice, then, the Robinson–Patman Act proscribes the same predatory conduct that violates section 2 of the Sherman Act. True it may be that the *Utah Pie* approach considers evidence of predatory pricing through a filter of "intent" (anticompetitive effects are inferred from predatory conduct, which is inferred from indirect evidence of intent in the form of surrounding economic circumstances), but as long as these surrounding circumstances are limited to evidence of the possibility of ultimate recoupment and of the relationship between price and cost, the technical inclusion of this step has no substantive significance. *Cf.* P. Areeda & H. Hovencamp, *Antitrust Law* ¶ 720', at 619 n. 8 (Supp.1989).

In addition to condemning "blatant predatory price discriminations," which are "intended to have immediate destructive impact," the *Utah Pie* court held that the Robinson–Patman Act also prohibits "price discrimination that erodes competition." 386 U.S. at 702–03, 87 S.Ct. at 1336. This category of proscribed conduct apparently encompasses anticompetitive behavior determined by an analysis of the relevant market and is recognized by most courts considering Robinson–Patman claims. *See, e.g., Lomar Wholesale Grocery, Inc. v. Dieter's Gourmet Foods, Inc.,* 824 F.2d

582, 596 (8th Cir.1987), *cert. denied,* 484 U.S. 1010, 108 S.Ct. 707, 98 L.Ed.2d 658 (1988); *Double H Plastics, Inc. v. Sonoco Products Co.,* 732 F.2d 351, 354 (3d Cir.), *cert. denied,* 469 U.S. 900, 105 S.Ct. 275, 83 L.Ed.2d 212 (1984); *Lloyd A. Fry Roofing Co. v. Federal Trade Comm'n,* 371 F.2d 277 (7th Cir.1966); *W.H. Brady,* 659 F.Supp. at 1377.

Because the discriminatory conduct determined unlawful by a market analysis is not necessarily predatory (*Utah Pie* described this conduct as distinct from predatory pricing), this court expressed in *Jays Foods* some confusion over exactly what sort of conduct is meant to ferreted out by the market analysis tool. *See* 656 F.Supp. at 846. Certainly *Utah Pie* did not intend to forbid pro-competitive activity; such a holding would be directly contrary to the underlying goals of the antitrust laws. In the words of the *Utah Pie* Court, then, no conduct will be found to violate the Robinson–Patman Act unless there is a substantial possibility that it will "erode competition." Concepts frequently borrowed from *Utah Pie,* such as "drastically declining price structure," cannot, therefore, simply be blindly applied; courts must also ask whether the questionable conduct, given the composition and characteristics of the relevant market, may erode competition. But just as persistently declining prices do not necessarily establish the presence of a Robinson–Patman violation, *Utah Pie* also teaches that a pattern of expanding sales in a particular market and evidence that some competitors continue to operate profitably in the face of price discrimination does not automatically exempt a defendant from liability under the Act. *See Utah Pie,* 386 U.S. at 702, 87 S.Ct. at 1335. This admonition, however, serves only to underscore the importance of examining the competitive implications of all suspect conduct and condemning only that conduct that has a negative effect.

The general framework for determining a Robinson–Patman violation thus established, we now turn to Ashkanazy's allega-tions of price discrimination in the kosher-for-Passover market. Ashkanazy's complaint alleges, separately, discrimination in both the retail and institutional markets, and we analyze those claims in turn.

a. *Reasonable Possibility of Injury to Competition—Retail Market*

■ We concluded *supra* that, as a matter of law, recoupment of losses had not occurred and could not reasonably be expected to occur in the retail market for kosher-for-Passover foods. The limited evidence of predatory intent submitted by Ashkanazy is certainly insufficient to overcome this conclusion, and the resolution of the Sherman Act claim therefore disposes of the predatory pricing component of the Robinson–Patman analysis as well. *See Jays Foods,* 656 F.Supp. at 846. Ashkanazy's claim will only survive, therefore, if it can be shown through a market analysis that Rokeach's pattern of discriminatory (but not necessarily predatory) prices eroded competition in the retail market. The parameters of the alleged discriminatory pricing behavior are similar in all respects except duration to those of the predatory pricing scheme; Ashkanazy asserts that Rokeach has sold kosher-for-Passover goods of like grade and quality at discriminatory prices to five retail independent stores: Milk Pail, Tel Aviv Grocery, Hungarian Sausage and Supermarket, New York Kosher, and Kosher City from 1983 to present (Ashkanazy Ans. to Int. No. 25).

Just as it seemed inconceivable in the predatory-pricing context that below-cost pricing in five of twenty-four stores could eliminate competition and permit monopoly-level pricing, so it appears implausible here that discriminatory prices offered to five stores could erode competition and allow Rokeach to dominate the market. The higher prices charged to the vast majority of stores will profoundly mitigate the effect of the price cuts offered to the five targeted stores and will prevent the deterioration of the price structure and the elimination of competitors. Indeed, Ashkanazy's claim of injury to competition resulting

from over five years of discriminatory pricing is belied by the total lack of proof that the market has become increasingly concentrated, that competitors' market shares have declined, or that profit levels have deteriorated. Rokeach faces competition not only from Ash, which has established a solid presence in the retail market, but also from Manischewitz, whose market share overshadows even Rokeach's. *Cf. National Dairy Products Corp. v. Federal Trade Comm'n,* 412 F.2d 605, 615 (7th Cir.1969) (relative strength of the defendant and his rivals relevant in determining effect of discrimination on competition). And the lack of evidence of high entry barriers suggests that even if current rivals were eliminated from the market, competition will not be " 'seriously or permanently damaged.' " *Jays Foods,* 656 F.Supp. at 846 (quoting *Henry,* 809 F.2d at 1345). The evidence simply does not present a factual dispute on the issue of whether Rokeach's discriminatory pricing creates a dangerous possibility that it may have eroded competition, and summary judgment in favor of Rokeach is therefore appropriate.

b. *Reasonable Possibility of Injury to Competition—Institutional Market*

 As was the case in the retail market, Ashkanazy's failure on his institutional predatory pricing claim for Sherman Act section 2 purposes dooms his argument of illegal price discrimination through predation. But although an analysis of the retail market failed to salvage Ashkanazy's Robinson–Patman claim with respect to that market, quite different results obtain here. The price discrimination alleged is broader in scope than the predatory pricing scheme at issue in the Sherman Act context; Ashkanazy claims that Rokeach offered lower prices across the board to nursing homes that purchased through Econocare than to nursing homes that dealt with Rokeach directly (Complaint ¶ 33). The possibility of anticompetitive effects, then, is not rendered immediately implausible by the limited nature of the discriminatory behavior.

An examination of the institutional market, moreover, raises the possibility of an injury to competition. There is evidence that the market has become increasingly concentrated and that Rokeach's competitors have experienced decreasing market shares. *Cf. W.H. Brady,* 659 F.Supp. at 1377 (market analysis indicated no erosion of competition where there was no evidence of a drastically declining price structure and where plaintiff's market share increased while defendant's decreased). Thus Ashkanazy testified that Manischewitz now sells to only four or five institutions "because they were pushed out of it indirectly. They couldn't make no profit" (Ashkanazy Dep. at 108). Ash stopped selling to Econocare during the 1989 Passover season (Gluck Dep. at 33), and even when he was doing business with Econocare, Ashkanazy claims that he was shut out of some member nursing homes (Ashkanazy Dep. at 186; Ashkanazy Aff. ¶ 8). Rokeach, with 80% of the market, is by far the strongest competitor in the market, and it appears that it is gaining strength.

This disparity in market shares is exacerbated by the possibility of high barriers to entry. Although direct evidence of entry barriers is sparse, the presence of some sort of obstacle to entry is suggested inferentially by the testimony that Rokeach is able to charge considerably higher prices to institutions in which he faces no competition (Schiff Dep. at 14, 162) and that prices would increase if Ash were excluded from the market (Tarkieltaub Dep. at 93). Rokeach has introduced testimony that Manischewitz could serve the institutional market and would welcome the opportunity (Goldberg Aff. ¶ 9), but its unwillingness to solicit the business of Econocare now (Gluck Dep. at 42) undercuts the persuasiveness of this claim. Alan Gluck, the President of Econocare, notes that a competitor is free to sell to institutions "around" his company, but there are recognized advantages to purchasing from Econocare (Gluck Dep. at 11), and a new entrant would likely be disadvantaged if it could not sell through it. We have already

concluded that Rokeach did not gain the favor of Econocare through illicit behavior, but entrenchment even through lawful conduct would make it more difficult for potential rivals to enter the market. Ashkanazy believes that his efforts to sell through Econocare would be futile (Ashkanazy Aff. ¶ 7), and if shared by others, this perception might deter would-be entrants.

Ashkanazy has not demonstrated that the price structure in the institutional market is deteriorating, and there is some evidence that his dollar sales have increased and that his profit levels have remained constant. This evidence, however, cannot overcome the possibility raised by the evidence of decreasing market shares and high entry barriers that Rokeach's discriminatory practices may have eroded competition. *Cf. Lomar Wholesale Grocery*, 824 F.2d at 598 ("[W]here there is no evidence of a 'drastically declining price structure,' or of increasing concentration in the market, an increase in the plaintiff's sales volume is inconsistent with a finding that the defendant's pricing has caused competitive injury." (citations omitted)). In light of this possibility, we must deny Rokeach's motion for summary judgment on the Robinson–Patman claim with respect to the institutional market.

### 3. *Robinson–Patman Sections 2(d) and 2(e)*

As part of the Robinson–Patman Act's efforts to prohibit discriminatory practices that would enable some buyers to gain competitive advantage over other buyers through pricing preferences from sellers, sections 2(d) and 2(e) of the Act proscribe indirect price discrimination effected through discriminatory advertising and service allowances. Although worded similarly, interpreted almost identically, and often invoked simultaneously, these two provisions diverge slightly in their coverage. Section 2(d) prohibits a seller from granting to some buyers allowances for promotional services unless he grants these allowances to all buyers on proportionally equal terms. Section 2(e) penalizes the actual provision of promotional services when furnished on a discriminatory basis. Ashkanazy maintains that these provisions have been violated, pointing to evidence of "bogus advertising allowances and 'damage' credits."

In its memorandum in support of its motion for summary judgment, Rokeach does not attack this argument, but Ashkanazy in effect forces the issue by defending this part of the Robinson–Patman claim in his response, provoking in Rokeach's reply memorandum an argument that the claim must be dismissed. Both parties, then, have had the opportunity to brief the issue —indeed, we would have willingly entertained a surreply on the part of Ashkanazy on this issue—and we therefore consider it ripe for resolution.

We are persuaded by Rokeach's argument that Ashkanazy lacks standing to assert these violations. Section 4 of the Clayton Act permits any private plaintiff "who shall be injured in his business or property by reason of anything forbidden in the antitrust laws" to assert an antitrust action for damages. 15 U.S.C. § 15 (1988). The plaintiff's injury not only must be causally linked to the violation but also must be "'of the type the antitrust laws were intended to prevent'" and must "'flow[] from that which makes the defendants' acts unlawful.'" *Cargill*, 479 U.S. at 109, 107 S.Ct. at 489 (quoting *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. 477, 489, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977)).

The injury asserted here is simply too remote from the alleged violations to confer standing under section 4. *See generally Blue Shield of Virginia v. McCready*, 457 U.S. 465, 476–84, 102 S.Ct. 2540, 2546–51, 73 L.Ed.2d 149 (1982). The essence of the sections 2(d) and 2(e) violations is the discrimination in the provision of promotional allowances and services among different buyers. Ashkanazy clearly is not injured by the alleged discrimination but

rather by the functionally lower prices offered to some buyers; granting the allowances and services across the board would insulate Rokeach from antitrust liability but would exacerbate Ashkanazy's injury. Nor is Ashkanazy so closely connected to the disfavored buyers that their injuries directly harm him. *See Frito–Lay, Inc. v. Bachman Co.*, 659 F.Supp. 1129, 1141 (S.D.N.Y.1986); *cf. Morris Electronics v. Mattel, Inc.*, 595 F.Supp. 56, 61–62 (S.D.N.Y.1984) (standing found where plaintiff-wholesaler's buyers were not granted allowances and services that were provided to direct retailers and would likely buy fewer of defendant's products from plaintiff as a result).

The relationship between the injury alleged and the types of injuries with which Congress was likely concerned in enacting sections 2(d) and 2(e) is similarly too remote. Unlike section 2(a) of the Robinson–Patman Act, which explicitly seeks to prevent competitive injury both at the seller level and at the buyer level, sections 2(d) and 2(e) are concerned only with competition "between buyers who compete[ ] in resales of the supplier's products." *Federal Trade Comm'n v. Fred Meyer, Inc.*, 390 U.S. 341, 356–57, 88 S.Ct. 904, 912, 19 L.Ed.2d 1222 (1968). Ashkanazy's injury is wholly unrelated to the sort of injury contemplated by these two provisions and as such falls outside of the purview of 2(d) and 2(e) protection. *See Frito–Lay*, 659 F.Supp. at 1141. Rokeach's motions to dismiss Ashkanazy's Robinson–Patman claim with respect to sections 2(d) and 2(e) is accordingly granted.

## C. *Clayton Act Section 3 Violation: Tying*

Asserting that Rokeach has an 80 to 100% market share in Chicago for single-serve portions of margarine, known as "readies," Ashkanazy alleges that Rokeach exploited this market power by refusing to sell readies (the "tying" product) to institutions unless they also purchased from Rokeach other kosher-for-Passover foods (the "tied" products). Rokeach urges dismissal of this claim on the basis of Ashkanazy's failure to prove any injury to him resulting from this arrangement; Ashkanazy is not a proper private plaintiff under section 4 of the Clayton Act, Rokeach argues, in light of this lack of proof.

In support of his claim, Ashkanazy points to two discrete areas of injury. First, he asserts that he lost sales to certain unidentified nursing homes on which Rokeach imposed its tying arrangement. In the several instances in which Ashkanazy was aware of the alleged tie-in, he testified, he was able to arrange for an alternative source of margarine so that the homes would not cancel their orders for Ash's goods; when asked to supply a concrete example of a lost nursing-home sale, Ashkanazy replied that he could not because he "would not know which ones [nursing homes] they were, but I'm sure if they tied in to people who I did know, they tied it to people I did [not] know and I'm sure that a just and reasonable estimate is I did lose sales in those other places too" (Ashkanazy Dep. at 402). Ashkanazy in essence is asking this court to infer injury—to assume the existence of a broader pattern of tying than he has demonstrated to this point. We note that before Ashkanazy is able to recover damages (assuming his claim is meritorious), he will have to prove not only the existence but also the quantity of injury, and because discovery is now closed, we suspect that he has collected whatever evidence he intends to put forward. We also note that Ashkanazy has himself limited the scope of the tying scheme through his answer to Rokeach's interrogatories (*see* Ashkanazy Ans. to Int. No. 22).[28] The proof offered for the purpose of this mo-

---

**28.** In his answer to this interrogatory, Ashkanazy claims that three nursing homes were the victims of Rokeach's illegal tie-in. One of those homes, Wilton House Nursing Home, was not mentioned by Ashkanazy in his deposition, and the possibility of lost sales to that home remains.

tion certainly is a far cry from what will be necessary at trial. It may also be insufficient on standing grounds to sustain Ashkanazy's claim. But because Ashkanazy has provided concrete evidence of a separate injury resulting from the alleged tie-in, we do not need to decide that question.

Once he was made aware of the tie-in arrangement with respect to several nursing homes, Ashkanazy claims, he made arrangements with an out-of-town supplier to provide margarine for those homes; Ashkanazy asserts further that he incurred expenses in the course of the arrangement process (Ashkanazy Aff. ¶ 13). In those homes where the tie-in allegedly was in effect, then, the cost to Ashkanazy of competing with Rokeach was increased. This injury is certainly an "antitrust injury" for the purpose of section 4 of the Clayton Act. Whether or not it is the type of injury that the laws proscribing tie-ins intended to prevent is less clear, but that is a separate inquiry under section 4 and one that Rokeach has chosen not to address. We therefore deny for now Rokeach's motion to dismiss this claim.

### D. Tortious Interference with Contractual Relations

#### 1. Ashkanazy's Contractual Relations with Suppliers

In paragraph 28 of Ashkanazy's complaint, he alleges that Rokeach purchased kosher-for-Passover foods from Ash's suppliers despite a contract between Ash and the suppliers; this interference, Ashkanazy elaborates in his answer to an interrogatory, took the form of phone calls in January of 1983 to Horowitz–Margareten and Season Products informing them of Ashkanazy's illness and suggesting that they should cease distributing to Ash.[29]

 The tort of interference with contractual relations comprises five ele-

ments: (1) a valid and enforceable contract; (2) the defendant's awareness of that contract; (3) an intentional and unjustified inducement of a breach of that contract; (4) a subsequent breach caused by the defendant's wrongful conduct, and (5) damages. *Getschow v. Commonwealth Edison Co.,* 111 Ill.App.3d 522, 529, 67 Ill.Dec. 343, 347, 444 N.E.2d 579, 583 (1st Dist.1982), *aff'd in part, rev'd in part on other grounds,* 99 Ill.2d 528, 77 Ill.Dec. 83, 459 N.E.2d 1332 (1984). With respect to each of the alleged instances of interference, Ashkanazy has failed to demonstrate the fourth element—actual breach. Despite Rokeach's representation to Horowitz–Margareten that Ashkanazy was gravely ill, Ashkanazy testified that "[m]y supplier did not go with him because he figured that he would just be buried if he did go with [Rokeach]" (Ashkanazy Dep. at 163). Rokeach's efforts with Season Products met with similar results; Ashkanazy conceded that "[t]here was no issue of damages because [Rokeach] didn't succeed" *(id.* at 167).

#### 2. Contractual Relations with Customers

 Rokeach's alleged interference with contractual relations was not limited to Ash's contracts with suppliers, Ashkanazy asserts. Oral contracts between Ash and several of his nursing home customers were breached by the homes when they started buying from Rokeach through Econocare. These oral agreements, Ashkanazy explained in his deposition, encompassed one-time orders from the homes; Ashkanazy would "go there, ... take an order from them and deliver the order" (Ashkanazy Dep. at 175). Ashkanazy categorically denied the existence of any ongoing relationship with these homes:

Q: Did you have an agreement with them that they would buy from you exclusively?

---

**29.** Ashkanazy supplements this answer in his memorandum in opposition to Rokeach's motions, arguing that Rokeach also interfered with Ash's exclusive distributorship arrangement with Horowitz–Margareten. This added allegation, however, goes beyond the scope of Ashkanazy's answer to the interrogatory, and we do not consider it.

A: No, none whatsoever.

Q: Did you have an agreement with them [that] they would buy from you every Passover?

A: No, none whatsoever.

Q: You didn't have any agreement other than if you could solicit an order ... they would buy from you?

A: Right. That's a verbal agreement. If they ordered, I delivered the stuff and their agreement was to pay me.

Q: And they were free to try to get orders from someone else if they wanted?

A: Yes.

(Ashkanazy Dep. at 175–76). The only contractual obligation on the part of the nursing homes under these oral agreements, then, was to pay for the goods delivered by Ash, and there is no allegation that Rokeach interfered with the homes' ability or readiness to pay. Because no contract extended beyond the immediate order, Rokeach's sales to these nursing homes, although possibly detracting from Ash's sales, clearly did not interfere with any existing contractual relationship.

E. *Rokeach's Interference with Prospective Business Expectancies*

■ To sustain an action for interference with prospective business expectancies, a plaintiff must demonstrate (1) a reasonable expectation of entering into a valid business relationship; (2) defendant's knowledge of the expectancy; (3) defendant's intentional and malicious interference to defeat the expectancy; and (4) damages suffered as a result of the interference. *North Broadway Motors, Inc. v. Fiat Motors, Inc.*, 622 F.Supp. 466, 469

(N.D.Ill.1984); *Downers Grove Volkswagen, Inc. v. Wigglesworth Imports, Inc.*, 190 Ill.App.3d 524, 527, 137 Ill.Dec. 409, 412, 546 N.E.2d 33, 36 (2d Dist.1989). Among the expectancies protected under this theory is the opportunity to obtain customers. *See Knapp v. McCoy*, 548 F.Supp. 1115, 1117 (N.D.Ill.1982). In soliciting and securing the business of nursing homes through Econocare,[30] Rokeach clearly circumscribed Ash's opportunity to sell to these homes, and although future oral contracts with the homes was not a certainty, it seems reasonable to expect that without the interference of Rokeach, Ash would have continued to enjoy their business.

■ Unless the interference is somehow wrongful, however, a claim for intentional interference with prospective advantage is not actionable. *See Panter v. Marshall Field & Co.*, 646 F.2d 271, 298 (7th Cir.), *cert. denied*, 454 U.S. 1092, 102 S.Ct. 658, 70 L.Ed.2d 631 (1981). Ashkanazy claims that Rokeach's efforts to solicit Econocare relied on "fraud, intimidation, and disparagement" and as such cannot be considered lawful interference. We rejected Ashkanazy's argument that Rokeach won its position as Econocare's chief supplier through bribes and secret dealings; however, Ashkanazy's Robinson–Patman claim that Rokeach charged lower prices to Econocare than to nursing homes buying independently survives Rokeach's motion for summary judgment. The continued viability of that claim breathes life into Ashkanazy's claim of interference with prospective advantage, for Rokeach's illegally low prices to Econocare may have prevented Ash from enjoying the patronage of customers that it would otherwise have obtained.[31]

---

**30.** Rokeach argues that it did not interfere with Ash's prospective advantage because Ash lost the four nursing homes when they joined Econocare. But because member homes can continue to purchase from independent suppliers after joining Econocare, Rokeach selling through Econocare is still competing with Ash; any improper means used by Rokeach to secure a position with Econocare or to win customers

through Econocare therefore may constitute interference.

**31.** Although Ashkanazy's tying claim remains in the suit as well, the alleged tie-in was limited to three homes: Wilton House Nursing Home, Glenview Terrace Nursing Home, and Sherwin Manor Nursing Home (Ashkanazy Ans. to Int. No. 22). Ashkanazy asserts interference with

## F. Consumer Fraud and Deceptive Business Practices

In his final claim, Ashkanazy alleges that Rokeach's practices run afoul of the Illinois Consumer Fraud and Deceptive Business Practices Act, Ill.Rev.Stat. ch. 121½, paras. 261–272 (1989).[32] Because Ashkanazy incorporates by reference all of his previous allegations of federal antitrust violations in this count, he apparently includes these claims among the unfair and deceptive practices that form the basis of liability in this count. Ashkanazy goes on to cite five specific examples of unfair practices on the part of Rokeach: (1) misrepresentations of Ashkanazy's health, prices, and "other relevant elements" to his suppliers; (2) false representations to institutions that it carried a full line of kosher-for-Passover food products followed by pressure on Ash's suppliers to fill the orders that Rokeach could not; (3) lower prices at the institutional level, subsidized by higher prices to retail stores maintained by an agreement with competitors; (4) sales of certain suppliers' products in Ash's exclusive territory, engineered by deceptively representing to these suppliers that it would not sell in the reserved territories; and (5) disparaging remarks regarding the Mrs. Adler's brand of gefilte fish, which Ash sells in the Chicago area.

The Consumer Fraud and Deceptive Business Practices Act ("Consumer Fraud Act") provides:

> Unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with the intent

that others rely upon the concealment, suppression or omission of such material fact, or the use or employment of any practice described in Section 2 of the "Uniform Deceptive Trade Practices Act" ... are hereby declared unlawful whether any person has in fact been misled, deceived or damaged thereby. In construing this section consideration shall be given to the interpretations of the Federal Trade Commission and the federal courts relating to Section 5(a) of the Federal Trade Commission Act.

Ill.Rev.Stat. ch. 121½, para. 262. A private cause of action is available to all persons who suffer damage as a result of a violation of the Act, *id.* at ¶ 270a, including competitors of the violator. *See Champion Parts, Inc. v. Oppenheimer & Co.,* 878 F.2d 1003, 1009 (7th Cir.1989). Whether a competitor-plaintiff must additionally demonstrate an injury to consumers generally has been an issue of some controversy, not squarely addressed by the Illinois Supreme Court, but the Seventh Circuit recently settled the issue for federal district courts in this circuit sitting in diversity, holding that the Illinois Supreme Court would likely adopt such a requirement were it to consider the issue. *First Comics, Inc. v. World Color Press, Inc.,* 884 F.2d 1033, 1039–40 (7th Cir.1989), *cert. denied,* —— U.S. ——, 110 S.Ct. 1123, 107 L.Ed.2d 1030 (1990); *see also Jays Foods, Inc. v. Frito–Lay, Inc.,* 664 F.Supp. 364, 369 (N.D.Ill.1987), *aff'd,* 860 F.2d 1082 (1988), *cert. denied,* 489 U.S. 1014, 109 S.Ct. 1125, 103 L.Ed.2d 188 (1989). To survive Rokeach's motions on this claim, then, Ashkanazy must show that the alleged unfair or deceptive practices injured consumers generally, either directly or indirectly by damage to competition. *See First Comics,* 884 F.2d at 1040.

---

prospective advantage with respect to three different homes (Ashkanazy Ans. to Int. No. 23).

**32.** Ashkanazy's complaint also cites ¶ 312 of chapter 121½, which is part of the Uniform Deceptive Trade Practices Act. To the extent that Ashkanazy intended to state a cause of action under that Act, the claim is dismissed, for the Deceptive Trade Practices Act provides only

for injunctive relief, plus costs and attorneys' fees, *see* Ill.Rev.Stat. ch. 121½, para. 313 (1989); *Jays Foods, Inc. v. Frito–Lay, Inc.,* 664 F.Supp. 364, 367 (N.D.Ill.1987), *aff'd,* 860 F.2d 1082 (1988), *cert. denied,* 489 U.S. 1014, 109 S.Ct. 1125, 103 L.Ed.2d 188 (1989), and Ashkanazy's complaint seeks monetary damages.

Although some of Ashkanazy's antitrust claims have not survived this motion for summary judgment, behavior that is lawful under antitrust standards may still transgress the Consumer Fraud Act if it is shown to be unfair or violative of the Deceptive Trade Practices Act. *See Jays Foods*, 664 F.Supp. at 367–68. With one exception, Rokeach does not attack Ashkanazy's Consumer Fraud Act claim on the grounds that the behavior is not unfair;[33] rather, it argues that Ashkanazy has not demonstrated any consumer injury resulting from any of the specific practices. We therefore consider whether Ashkanazy has made a sufficient showing of injury to competition with respect to all of the arguably unfair or deceptive acts alleged in his complaint.

**—Misrepresentations of Ashkanazy's health.** Regardless of whether Rokeach's statements regarding Ashkanazy's illness in fact misrepresented the state of his health, there is no indication that the dissemination of this information caused any supplier to drop Ash or impaired competition in any way.

**—Interference with exclusive contract.** The effect of this allegedly unfair act was to increase the number of sellers of the product at issue in Ash's "reserved" territory. More competitors generally translates into lower prices, which would benefit consumers; indeed, in his complaint, Ashkanazy asserts merely that this interference deprived him of sales and caused him financial harm. Ashkanazy has offered no proof that this interference injured anyone but him, and it therefore is not actionable under the Consumer Fraud Act. *See Bonfield v. AAMCO Transmissions, Inc.*, 708 F.Supp. 867, 883 (N.D.Ill.1989).

**—Pressure on Ash's suppliers to increase prices.** There is no elaboration in Ashkanazy's memorandum regarding the alleged "Jewish curse" threatened by Rok-

each and certainly no indication that this threat caused Ashkanazy to raise prices and lose business or impaired competition. As explained *supra* at 20–22, moreover, there is no suggestion that Rokeach's attempts to persuade Ash's suppliers to raise prices to Ash were successful or, if successful, affected the price at which Ash could purchase matzo products. Accordingly, Ashkanazy has failed to establish the requisite repercussions with respect to consumers.

**—Predatory pricing.** Both in the retail independent and in the institutional markets, the scope of the alleged predatory pricing schemes were very limited. As a result, we concluded that there was no evidence that Rokeach could recoup the losses it endured during the period of below-cost prices. These schemes, then, begot only the lower prices that consumers desire.

**—Price–fixing scheme.** The alleged price collusion, we concluded, did not create a dangerous probability of monopoly because of its limited scope and duration, if it even existed. Nor has Ashkanazy demonstrated that parallel pricing created inflated prices for consumers.

**—Bribes and secret deals.** Although we held that Rokeach had not bribed the President of Econocare and that the secret deals did not appear to be anticompetitive, this conduct still may be unfair for the purposes of the Consumer Fraud Act, and Rokeach's focused argument requires us to assume that unfairness. These acts, Ashkanazy claims, secured for Rokeach a favored position with Econocare, but suppliers are free to sell around Econocare and compete with Rokeach for member nursing homes. That Rokeach's dominance of Econocare may create an entry barrier to future competitors does not bear on the question of whether competition has in fact been stifled; it speaks only to the possibility of impaired competition down the line.

---

33. The alleged disparaging remarks made regarding Mrs. Adler's line of gefilte fish, Rokeach claims, represented merely an opinion rather than a misrepresentation and as such are not actionable under the Consumer Fraud Act. Because we find that Ashkanazy has failed to assert that this remark injured consumers generally, however, we do not reach that argument.

**—Price discrimination in the retail market.** Ashkanazy has not asserted a direct injury to consumers resulting from this discrimination, and our discussion *supra* at 47–49 indicates that there is no reasonable possibility that the discrimination may harm competition.

**—Price Discrimination in the institutional market.** The alleged Robinson–Patman violation in the institutional market, we concluded, survives the summary judgment motion because of the reasonable possibility that Rokeach's discriminatory pricing pattern may have eroded competition in that market. This alone does not satisfy Ashkanazy's burden to establish consumer injury, however, because the Robinson–Patman inquiry is designed to detect discriminations "in their incipiency" and thus looks forward to the possible future effects of the violation. *See Falls City*, 460 U.S. at 435, 103 S.Ct. at 1288; *National Dairy Products*, 412 F.2d at 614–15. But Ashkanazy has proffered evidence of actual injury as well: Ashkanazy testified that he lost some customers to Rokeach's low Econocare prices (Ashkanazy Dep. at 186), and Schiff indicated that Rokeach's prices were 30% higher in those homes where it had no competition (Schiff Dep. at 14, 162). The Consumer Fraud Act claim with respect to discriminatory pricing in the institutional market, then, is supported by a sufficient showing of consumer injury to withstand Rokeach's summary judgment challenge.

**—Robinson–Patman sections 2(d) and 2(e).** Ashkanazy's discussion of the section 2(d) and 2(e) violations focuses on the fact of the alleged conduct and not the implications. Proof of injury to consumers, therefore, is lacking.

**—Illegal tie-in.** Although Ashkanazy's tying claim survives the summary judgment motion, it does so just barely, and the antitrust injury that we found Ashkanazy to have plausibly suffered is quite insignificant and certainly has not been shown to affect consumers in general. No other evidence suggesting an injury to consumers has been advanced.

**—Interference with prospective relations.** This claim, too, remains in the case due to the success of Ashkanazy's institutional Robinson–Patman claim at the summary judgment level. Any consumer injury resulting from the interference, then, would be coextensive with the injury due to the underlying discriminatory pricing; the fact that this discrimination interferes with Ash's business expectancy does not in itself add to the possible harm to consumers. Ashkanazy is entitled, however, to proceed on this theory as well.

**—False representations of full-line supplies.** This allegedly unfair act, introduced in Ashkanazy's Consumer Fraud Act claim, is not discussed anywhere in his brief; certainly the complaint, which mentions only that the scheme was undertaken to win sales from Ash, does not assert an injury to consumers in general.

**—Lower institutional prices subsidized by higher retail prices.** Again, this allegedly unfair practice appears for the first time in the Consumer Fraud Act claim, although it strikes a similar chord to Ashkanazy's previous allegations of Robinson–Patman violations. The only proof of injury with respect to lower institutional prices, however, relates to the discriminatory pricing *within* the institutional market. To the extent that this claim is different from the intra-market claims of price discrimination, Ashkanazy has not introduced any evidence of added consumer injury.

**—Disparaging remarks regarding Mrs. Adler's gefilte fish.** These allegedly deceptive representations have, Ashkanazy's complaint asserts, damaged his goodwill and instilled in his customers a false impression of his product. A "false impression," however, is not tantamount to an injury, and Ashkanazy has not demonstrated that an artificially created consumer inelasticity of demand for Rokeach's gefilte fish allowed Rokeach to charge higher prices or otherwise impaired competition.

## CONCLUSION

Rokeach's summary judgment challenge has enfeebled but not extinguished Ashka-

nazy's claim of antitrust violations and unfair competition. Surviving Rokeach's challenge are (1) the Robinson–Patman claim with respect to the institutional market; (2) the tying claim in its entirety; (3) a limited claim of interference with prospective business relations; and (4) the Consumer Fraud Act claim based on discriminatory pricing in the institutional market and interference with prospective business relations. Rokeach's motion for summary judgment is granted with respect to all remaining claims.